

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-23-1998

# In Re: Prudential Insur.

Precedential or Non-Precedential:

Docket 97-5155,97-5156,97-5217,97-5312

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"In Re: Prudential Insur." (1998). *1998 Decisions.* Paper 169.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/169

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 23, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-5155, 97-5156, 97-5217 & 97-5312

IN RE: PRUDENTIAL INSURANCE COMPANY
AMERICA SALES PRACTICE LITIGATION AGENT ACTIONS

RICHARD P. KRELL, MDL transfer, N.D. Ohio,
DNJ Civil Action No. 95-6062

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA

      Richard P. Krell, as well as Objectors
      Elizabeth Bajek, Amanda Bajek,
      Helen Bartsch, Mark Ciconte,
      Raymond Dolce, Margaret Dolice,
      Louise Duggan, Peter Duggan,
      Charles Duncan, Mary Howe, Mary Krell,
      William Morris, Diana Racer, Thomas Racer,
      Gweneth Reidel, The Estate of Carl J. Scalzo,
      Marie Scalzo, Terry Sligar, Alice Smith,
      Jerry Smith, and William Walton,
      Appellants at Nos. 97-5155/5156/5312

IN RE: PRUDENTIAL INSURANCE COMPANY
AMERICA SALES PRACTICE LITIGATION AGENT ACTIONS

RICHARD JOHNSON,
Intervenor-Plaintiff in District Court

      Richard E. Johnson,
      Appellant at No. 97-5217

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 95-cv-04704)

Argued January 26, 1998

Before: SCIRICA, ROTH and RENDELL, Circuit Judges

(Filed July 23, 1998)

MICHAEL P. MALAKOFF, ESQUIRE
 (ARGUED)
Malakoff, Doyle & Finberg
The Frick Building, Suite 200
Pittsburgh, Pennsylvania 15219

 Attorney for Appellants,
 Richard P. Krell, et al.

LYNDE SELDEN, II, ESQUIRE
Lynde Selden Chartered
501 West Broadway, Suite 845
San Diego, California 92101

 Attorney for Appellant,
 Richard E. Johnson

MELVYN I. WEISS, ESQUIRE
 (ARGUED)
Milberg, Weiss, Bershad, Hynes &
 Lerach
One Penn Plaza, 49th Floor
New York, New York 10119

ALLYN Z. LITE, ESQUIRE
Goldstein, Lite & DePalma
Two Gateway Center, 12th Floor
Newark, New Jersey 07102

 Attorneys for Appellee,
 George A. Zoller, Class Action
 Plaintiff Representative

2

REID L. ASHINOFF, ESQUIRE
 (ARGUED)
MICHAEL H. BARR, ESQUIRE
Sonnenschein, Nath & Rosenthal
1221 Avenue of the Americas,
 24th Floor
New York, New York 10020

 Attorneys for Appellees,
 The Prudential Insurance
 Company of America and
 Ron D. Barbaro

BRIAN S. WOLFMAN, ESQUIRE
 (ARGUED)
ALAN B. MORRISON, ESQUIRE
Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, D.C. 20009

 Attorneys for Amicus Curiae-
 Appellant, Public Citizen, Inc.

JOHN J. GIBBONS, ESQUIRE
Gibbons, Del Deo, Dolan, Griffinger
 & Vecchione
One Riverfront Plaza
Newark, New Jersey 07102-5497

 Attorney for Appellee,
 Robert C. Winters

FREDERICK B. LACEY, ESQUIRE
LeBoeuf, Lamb, Greene & MacRae
One Riverfront Plaza
Newark, New Jersey 07102

 Attorney for Appellee,
 Frances K. Beck, as Executrix of
 the Estate of Robert A. Beck

3

TABLE OF CONTENTS

OPINION OF THE COURT                                    6

I. BACKGROUND AND PROCEDURAL HISTORY                    8
 A. The Multi-State Life Insurance Task Force           8
 B. The Federal Class Action                            11
  1. The Proposed Settlement                            16
   a. The Alternative Dispute Resolution process        17
   b. Basic Claim Relief                                20
   c. Enhancements To the Task Force Plan               20
  2. The Fairness Hearing                               23

II. ISSUES RAISED ON APPEAL AND STANDARD OF
        REVIEW                                          25

III. JURISDICTION                                       26
 A. Subject Matter Jurisdiction                         26
  1. Federal Question Jurisdiction as a Basis for
        Supplemental Jurisdiction                       28
  2. Diversity Jurisdiction as a Basis for Supplemental
        Jurisdiction                                    34
 B. Personal Jurisdiction                               39
 C. Article III                                         40

IV. CLASS CERTIFICATION                                 42
 A. Settlement-Only Class Certification                 42
 B. Class Certification under Rule 23                   45
  1. The Rule 23(a) Criteria                            46
   a. Numerosity                                        46
   b. Commonality                                       47
   c. Typicality                                        49
   d. Adequacy of Representation                        52
  2. The Rule 23(b) Criteria                            55
   a. Predominance                                      55
   b. Superiority                                       59
 C. Conclusion                                          60

V. THE FAIRNESS OF THE PROPOSED
        SETTLEMENT                                      60
 A. The Girsh Factors                                   66
  1. The complexity and duration of the litigation      66
  2. The reaction of the class to the settlement        66
  3. The stage of the proceedings and amount of
        discovery completed                             68

4

4. The risks of establishing liability and
   damages                                                    69
 a. Replacement Claims                                        70
5. The risks of maintaining the class action
   through trial                                              72
6. The ability of the defendants to withstand a
   greater judgment                                           73
7. The range of reasonableness of the settlement
   fund in light of the best possible recovery and
   all the attendant risks of litigation                      74
 B. Other Objections                                          78
 1. The Rules Enabling Act and the McCarran –
    Ferguson Act                                              78
 2. Failure to Allow Discovery                                79
 C. "Other Sales Claims"                                      80
 1. The Alleged Expansion of the Class                        81
 2. Adequacy of Class Notice                                  83
 D. Conclusion                                                87

VI. ATTORNEYS' FEES                                           88
 A. The Fee Agreement                                         88
 B. Fee Opinion                                               90
 C. Analysis                                                  96
 1. "Clear-Sailing" Fee Agreement                             99
 2. Adverse Effect on Class Members                          101
 3. Fairness of the Award                                    102
  a. The Value of the Settlement                             102
  b. The Appropriate Percentage Recovery                     107
  c. Lodestar Calculation                                    110
   i. Multiplier                                             110
   ii. Time Records                                          113
 D. Conclusion                                               114

VII. KRELL'S MOTION TO RECUSE                                114
 A. Procedural History                                       114
 B. Legal Standard                                           116
 C. Krell's Arguments on Appeal                              116
 1. Ex Parte Meetings                                        116
 2. The Conference With State Insurance
    Regulators                                               117
 3. Rutt v. Prudential                                       119

VIII. CONCLUSION                                             121

OPINION OF THE COURT

SCIRICA, Circuit Judge.

This is an appeal from the approval of the settlement of a nationwide class action lawsuit against Prudential Life Insurance Company alleging deceptive sales practices affecting over 8 million claimants throughout thefifty states and the District of Columbia.

The class is comprised of Prudential policyholders who allegedly were the victims of fraudulent and misleading sales practices employed by Prudential's sales force. The challenged sales practices consisted primarily of churning, vanishing premiums and fraudulent investment plans, and each cause of action is based on fraud or deceptive conduct. There are no allegations of personal injury; there are no futures classes. The settlement creates an alternative dispute resolution mechanism and establishes protocols to determine the kind and amount of relief to be granted. The relief awarded includes full compensatory damages consisting of what plaintiffs thought they were purchasing from the insurance agent. There is no cap on the amount of compensatory damages for those who qualify, and although punitive damages are not included in the settlement, Prudential has agreed to pay an additional remediation amount in addition to the payments made through dispute resolution process.

The case involves five consolidated appeals from the judgments of the District Court for the District of New Jersey approving the settlement and awarding attorneys' fees to class counsel. Appellants, members of the certified class who object to the settlement, challenge the district court's jurisdiction, the certification of the settlement class, the fairness of the settlement itself, the award of attorneys' fees, and the district court's refusal to disqualify itself.

We hold the district court properly exercised jurisdiction. Federal subject matter jurisdiction is properly grounded on the alleged violations of the federal securities laws. Although most of the claims implicate state law,

supplemental jurisdiction is proper because all of the claims arise out of a common nucleus of operative fact. The district court had personal jurisdiction over the class because actual notice was given to each of the 8 million policyholders by direct mail, and disseminated through television, radio and print advertising throughout the fifty states and the District of Columbia. We also hold there was no reason for the district court to recuse itself from these proceedings.

The district court properly certified a national class under Fed. R. Civ. P. 23(b)(3). The court assessed the numerosity and commonality of the asserted claims, the typicality of those claims, and the adequacy of representation provided by the named plaintiffs and class counsel, and found they satisfied the certification standards. The court also concluded the proposed class action was the superior means of addressing plaintiffs' claims of widespread sales abuse, and the issues common to all members of the class predominated over individual issues related to the members of the class.

We hold the district court properly evaluated the settlement, finding it fair, reasonable and adequate. Prudential's deceptive practices occurred nationwide. It may be argued that problems national in scope deserve the attention of national courts when there is appropriate federal jurisdiction. Because of the extraordinary number of claims, fairness counsels that plaintiffs similarly injured by the same course of deceptive conduct should receive similar results with respect to liability and damages. The proposed class settlement offers plaintiffs several advantages, including full compensation for their injuries, no obligation to pay attorneys' fees, and a relatively speedy resolution of their claims. The alternative dispute resolution process is sensible and provides adequate safeguards for individual treatment of claims, including appeals. We will affirm the district court's approval of the class certification and the settlement.

The district court awarded $90 million in attorneys' fees as a percentage of a common fund created under the settlement. We will vacate and remand the fee award and ask the district court to recalculate the fee to account for

work done by the multi-state task force whose efforts served as a basis for the final settlement in this case. Furthermore, we question the multiplier employed in the lodestar analysis used by the court to cross check the size of the fee award. Although granting discovery on fee applications is within the sound discretion of the district court, we will ask the district court to reconsider whether it should grant limited discovery to the objectors on the fee application.

I. BACKGROUND AND PROCEDURAL HISTORY

This case began in early 1994, when the first of many individual and class action lawsuits alleging improper sales and marketing practices was filed against Prudential, the nation's largest life insurer. As lawsuits began to accumulate, the New Jersey Insurance Commissioner sought to organize a group to investigate the allegations against Prudential.[1] The resulting investigation into market conduct sought to determine the scope of any improper sales practices, and to develop a remedial plan designed to compensate injured policyholders, to prevent future violations, and to restore public confidence in the insurance industry. Report of The Multi-State Life Insurance Task Force and Multi-State Market Conduct Examination of The Prudential Insurance Company of America at 2 ("Task Force Report"). While the Task Force proceeded with its investigation, federal and state court actions alleging sales practice abuses by Prudential continued to accumulate. Although our primary concern is the outcome of the federal litigation, the history of both the Multi-State Life Insurance Task Force's investigation and the various lawsuits filed against Prudential overlap to a certain degree, and thus warrant discussion.

A. The Multi-State Life Insurance Task Force

At the instigation of the New Jersey Insurance Commissioner, the Multi-State Life Insurance Task Force was formed on April 25, 1995, with the stated goal of

_____

1. The New Jersey Department of Banking and Insurance also conducted an independent market conduct investigation of Prudential's New Jersey business. Its report was issued on July 9, 1996.

conducting a thorough and extensive examination of
Prudential's sales practices during the period from 1985
until 1995. In all, thirty states and jurisdictions elected to
participate.2 The Task Force interviewed 283 agents and 27
sales management executives, and reviewed voluminous
materials provided by Prudential. Among those materials
were internal computer data bases reflecting complaints,
policy transactions, and agent discipline. The Task Force
also reviewed market conduct reports prepared by other
states which had examined Prudential's business practices,
and examined the historical developments which affected
sales practices in the insurance industry.3

In July 1996, the Task Force issued its final report, citing
widespread evidence of fraudulent sales practices and
inadequate supervision by Prudential's management. It
explained that Prudential's records revealed the company

_____

2. According to the Task Force Report, eleven states and the District of
Columbia "actively participated" in the investigation: Arizona, Arkansas,
California, Illinois, Maryland, Massachusetts, Minnesota, Nevada, New
Jersey, Ohio, and Washington. These twelve jurisdictions represented
approximately 36.5 percent of the 10.7 million Prudential policies sold
during the investigation period. Report of the Multi-State Life Insurance
Task Force and Multi-State Market Conduct Examination of the Prudential
Insurance Company of America at 1-2 ("Task Force Report"). The Attorney
General of the State of Connecticut began a separate investigation of
Prudential in April 1995, in response to the filing of a class action
complaint in United States District Court for the District of Connecticut.
Although the Connecticut Insurance Commissioner subsequently joined
the Multi-State Task Force, the Attorney General completed its
independent investigation and issued a report on November 21, 1995.

3. According to the Task Force Report, a combination of regulatory and
economic changes in the 1970s and 1980s created an atmosphere within
the insurance industry that was more amenable to the replacement of
insurance policies. For example, the rise in interest rates allowed
insurance companies to offer new products "designed to compete with
banks, money market funds and newly founded life insurers," and thus
led companies to abandon their usually conservative approach. Task
Force Report at 7. At the same time, the original model replacement
regulations, which stated that replacement transactions were generally
not in the best interest of the customer, were modified to allow for these
transactions in certain cases. See discussion infra S V.A.4. & n.66. As a
result of these changes, replacement activity flourished.

"knew of cases of alleged misrepresentation and other improper sales practices by its agents, and in many instances failed to adequately investigate and impose effective discipline." Task Force Report at 15. According to the report, interviews with Prudential agents revealed "little if any consistency in agent training and agent awareness of company and regulatory guidelines." Id. at 16. While the Task Force concluded that not all of the sales during the time period investigated were fraudulent or improper, it recognized the difficulty in ascertaining precisely which policyholders had been harmed,4 and therefore recommended the implementation of a remediation plan which would "reach out to all potentially affected policyholders." Id. at 17–18. Under the plan, which was developed with Prudential's input and cooperation, policyholders were given the option of pursuing claims in an Alternative Dispute Resolution process ("ADR") or through a "no-fault" remedy known as Basic Claim Relief.5

As part of the Task Force Plan, Prudential agreed to conduct an extensive outreach program, including individual notice to all persons who purchased a policy between 1982 and December 31, 1995. Those electing the ADR process could submit their claim for evaluation. The remediation plan addressed four categories of claims: financed or replacement sales; sales involving abbreviated payment plans; life insurance sold as an investment; and other claims "falling outside of the first three categories." Id. at 19. Those electing Basic Claim Relief would be eligible for preferred-rate loans or the opportunity to purchase discounted policies.

Forty-three states and the District of Columbia signed a Consent Order adopting the Task Force Plan, with the understanding that if the pending class action achieved a

_____

4. The Task Force found that, "[b]ecause of the nature of the transactions and possible improprieties, an electronic analysis could not identify every instance of sales abuse or violation of law or regulation." Task Force Report at 6.

5. The structure of this remediation plan was based on a settlement reached between a number of the class counsel here and New York Life Insurance Company in a similar class action. Task Force Report at 198.

better result, the Task Force and the states could join in the improved plan. The Task Force also recommended a separate $35 million fine to be divided among the states and the District of Columbia.

B. The Federal Class Action

While the Task Force was conducting its investigation, parties continued to file individual claims and class actions against Prudential in both state and federal court. On February 6, 1995, named plaintiff Nicholson filed a class action in Illinois state court which was removed one month later to the United States District Court for the Southern District of Illinois. The Kuchas plaintiffs filed their federal class action on February 28, 1995 in the District of Connecticut. Four other federal class actions were filed in the District of New Jersey in early 1995. Appellant Krell filed his class complaint in Ohio state court in June 1995.

On April 26, 1995, Prudential moved to consolidate the various federal actions in the District of New Jersey. On August 3, 1995, the Judicial Panel on Multidistrict Litigation granted Prudential's motion and transferred several actions to the District of New Jersey.6 Prudential then removed the various state actions to federal court, including the Krell action, and requested these additional cases be consolidated in New Jersey. The MDL Panel granted that request as well.7

In October 1995, the district court appointed Melvin Weiss of Milberg, Weiss, Bershad, Hynes & Lerach and Michael B. Hyman of Much, Shelist, Freed, Deneberg, Ament, Bell & Rubenstein as Co-Lead Counsel for plaintiffs, and ordered plaintiffs to file a consolidated complaint. On October 24, 1995, plaintiffs filed the First Consolidated Amended Class Action Complaint.

_____

6. More than 100 actions have been centralized in the District of New Jersey by the MDL Panel. In re The Prudential Ins. Co. of America Sales Practice Litigation, 962 F. Supp. 450, 479 n.13 (D.N.J. 1997) ("Fairness Opinion").

7. Appellant Krell moved the district court to remand his case to state court. After the district court denied that motion on April 16, 1996, Krell
filed a petition for mandamus relief with this Court. We denied that motion without opinion on September 25, 1996.

The named plaintiffs filed suit on behalf of all persons who purchased new or additional life insurance policies between January 1, 1980 and the time of the complaint as a result of Prudential's alleged fraudulent scheme. 8 They alleged that Prudential management developed and implemented a fraudulent scheme to sell life insurance policies through a variety of deceptive sales practices, including "churning," "vanishing premium," and "investment plan" sales tactics. Plaintiffs also challenged Prudential's dividend practices, among them the so-called "investment generation approach," and "Prudential's deceptive administration of class members' policies to conceal fraudulent sales and effectuate the scheme, including Prudential's use of unauthorized policy loans and similar contrivances to deplete policyholders' cash values." Lead Counsel Brief at 5. The Complaint alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, common law fraud, breach of contract, bad faith, negligent misrepresentation, negligence, unjust enrichment, and breach of state consumer fraud statutes.

On December 26, 1995, Prudential moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6). At the same time, Prudential approached Lead Counsel to discuss a possible settlement. Those discussions ended, however, when Lead Counsel indicated they would not settle the case without significant discovery. The parties renewed their settlement discussions in early 1996, after Prudential agreed to provide discovery, but once again failed to reach an agreement. When the talks ceased, Prudential stopped its production of documents. Lead Counsel nevertheless pursued its own investigation, interviewing approximately thirty former Prudential agents and customers, and reviewing the limited array of documents provided by Prudential.

The district court granted Prudential's motion in part on May 10, 1996, dismissing without prejudice all claims of three of the five named plaintiffs, and several claims of the

_____

8. Krell declined to join the class, claiming that Ohio policyholders with replacement claims deserved the protection of Ohio insurance law. Krell Brief at 5.

remaining two. It also noted that plaintiffs would not likely prevail on many of their claims at trial. The district court then ordered Prudential to provide plaintiffs with copies of the substantial discovery materials already provided to the Task Force.

Following the issuance of the Task Force Report in July 1996, Lead Counsel and Prudential once again entered settlement negotiations, and again Prudential agreed to Lead Counsel's demands for discovery.9  By August 8, 1996, Prudential had provided plaintiffs with over 70 boxes of documents in response to Lead Counsel's requests.

On September 19, 1996, plaintiffs filed their Second Amended Consolidated Complaint. The Second Amended Consolidated Complaint contained essentially the same claims as the first, alleging Prudential implemented a systematic fraudulent marketing scheme which made use of false and misleading sales presentations, policy illustrations, and marketing materials. Once again, the Complaint specifically referred to Prudential's "churning," "vanishing premium," and "investment plan" sales tactics.10 Each of the named plaintiffs claimed to have been injured by this common scheme, and alleged one or more of the specified sales practices.11 Plaintiffs also sued several

_____

9. According to Lead Counsel, the negotiations then proceeded through three stages. The first, from July 6th through August 16th, involved preliminary negotiation of the terms of settlement. During the second phase, which ran from August 17th through September 22nd, the parties negotiated the details of the actual Settlement Agreement. Finally, from September 23rd until October 28th, the parties worked out the final Stipulation of Settlement. Weiss Aff.P 103.

10. While the Complaint stated that "Prudential's scheme involved [these] three notorious deceptive life insurance sales tactics," Second Am. Cons. Compl. P 5, the allegations detailed therein also refer to other sales abuses which fall outside these three categories. See, e.g., Second Am. Cons. Compl. P 89-91 (alleging Prudential took affirmative steps to conceal its misrepresentations); P 114-16 (alleging Prudential agents informed the Nicholson plaintiffs to "ignore" notices concerning lapses in their policies); P 128 (alleging a Prudential agent made unauthorized withdrawals from the policy of named plaintiff Dorfner).

11. Carol Nicholson brought suit as executrix of the estate of her deceased husband Keith. From 1966 to 1984, the Nicholsons purchased

persons in their individual capacities: Robert A. Beck, Prudential President from 1972 until 1979 and Chairman from 1978 until 1987; Ronald D. Barbaro, Prudential's President from 1990 until 1992; and Robert C. Winters, Chairman and CEO from 1987 until 1994, and President from 1993 until 1994.

According to the Second Amended Consolidated Complaint, Prudential was aware of these fraudulent sales practices as early as 1982, when internal investigations

_____

four Prudential policies worth approximately $30,000. In 1986, Keith Nicholson purchased an addition $100,000 policy, allegedly as a result of Prudential's fraudulent sales practices. Carol Nicholson alleged churning, vanishing premium and investment plan claims.

Martin Dorfner and his wife operate a small grocery store in Pennsylvania. By July 1989, they owned several Prudential policies. Dorfner alleges that his Prudential agent informed the Dorfners that they were entitled to a "free" policy, and proceeded to open another whole life policy for them using funds drawn from their existing policies. In addition, the same agent persuaded the Dorfners to purchase a $50,000 variable appreciable life insurance policy from Prudential in April 1991, allegedly using misleading sales information. Dorfner brought suit in January 1995, alleging churning and vanishing premium claims.

Vincent and Elizabeth Kuchas are Connecticut residents who purchased individual variable life policies from Prudential. In 1987, their agent suggested that they purchase additional policies. The Kuchases allege that they informed the agent that they were seeking an investment similar to an IRA, and could not afford an investment plan if they had to continue payment on their current Prudential policies. The agent allegedly persuaded the Kuchases to purchase two VAL policies while misinforming them as to their continuing payment obligations with respect to their initial policies. In September 1994, the Kuchases learned that the initial policies had lapsed and that their agent had taken out loans against the initial policies to pay for the VALs. They filed suit in February 1995.

Norman Gassman, an Ohio citizen, filed suit against Prudential in May of 1995, alleging an investment plan claim. According to Gassman, a Prudential agent persuaded Gassman to take $20,000 from a certificate of deposit and "invest" it in a VAL policy. Gassman alleges that the agent held himself out as a "financial planner" or"financial consultant" and explained that a VAL policy was part of an "investment plan," paid a higher rate of interest than a CD at a low risk, and was tax free. In reliance on these representations, Gassman purchased the VAL policy.

14

discovered patterns of abuse involving financed insurance. Plaintiffs alleged that Prudential failed to take serious steps to combat the abuses, focusing instead on "damage control" and warning internal auditors not to "rock the boat." For example, when Prudential's auditing department tested a new computer system to detect churning in its Minneapolis office, sales dropped off sharply. Instead of addressing the concerns raised by the audit department, Prudential merely referred the matters to the "marketing" group, which took no steps to stop the fraudulent activities. Second Am. Cons. Compl. P 86.

Three days after the filing of the Second Amended Consolidated Complaint, Prudential and class counsel entered into a settlement agreement. There were three preconditions to the agreement. First, those states which had adopted the Task Force Remediation Plan through the execution of the Consent Order had to agree to modify the Consent Order to conform to the Settlement Agreement. Second, the final Stipulation of Settlement had to be executed by October 28, 1996. Lastly, the parties reserved the right to modify the Stipulation of Settlement to reflect any new information revealed by class counsel's ongoing discovery.12 The Settlement Agreement did not address attorneys' fees.13

On October 28, 1996, the parties filed a final Stipulation of Settlement. At that time, the district court issued an order conditionally certifying a national settlement class, directing issuance of class notice, issuing an injunction,14

_____

12. On October 25, 1996, Prudential formally responded to plaintiffs' discovery requests, producing over one million pages of documents, 160 computer diskettes, and more than 500 audio and video tapes. See Weiss Aff. P 85.

13. Although S K of the Settlement Agreement was entitled "Attorneys' Fees, Costs and Expenses," subsection K.1 was left blank. Subsection K.2 addressed certain additional expenses to be included in any payment of fees, and guaranteed that any payment of fees would not reduce the remedies provided under the agreement. Subsection K.3 also provided that Prudential's liability for fees would be limited only to those fees expressly provided for by the Settlement Agreement.

14. The injunction barred policyholders from pursuing overlapping litigation unless the policyholder had opted out of the class, and

and scheduling a fairness hearing for January 21, 1997. The notice was sent to each of the more than 8 million class members by first class mail on or before November 4, 1996, and gave them until December 19, 1996 to file objections or opt out of the class.15

## 1. The Proposed Settlement

The proposed settlement was largely based on the Task Force Report and its proposed remediation plan. Like the Task Force plan, the settlement proposed a remediation scheme by which class members had the option of either pursuing their claims through an Alternate Dispute Resolution procedure or electing Basic Claim Relief. The proposed settlement class included all persons who owned one or more Prudential insurance policies between January 1, 1982 and December 31, 1995, with certain exceptions.16

_____

prevented them from excluding other policyholders from the class. After the class notice was mailed, several named plaintiffs in a competing nationwide class action, filed and certified in Alabama state court three days after the Settlement Agreement was signed (the"Steele action"), opted out of the class. The so-called "Steele Opt-outs" also attempted, as class representatives in the Steele action, to execute opt-outs on behalf of the entire class. At Prudential's request, the district court issued an Order to Show Cause on January 22, 1997. On May 28, 1997, the district court ruled that the opt-out of the Steele class was null and void as a violation of the permanent injunction. The Steele Opt-outs filed an appeal with this Court. We affirmed the district court in an unpublished opinion.

15. In December 1996, Krell moved the district court to recuse itself. The district court denied the motion, and Krell's subsequent petition for mandamus relief was denied by this Court without opinion on April 4, 1997.

16. The following were explicitly excluded from the class: 1) policyholders who were represented by counsel and had already settled a claim and signed a release with Prudential; 2) policyholders that are corporations, banks, trusts or other non-natural entities that purchased policies as corporate or trust-owned life insurance and under which a) there are fifty or more separate insured individuals, or b) the aggregate premium paid over an eight year period, ending with the close of 1996, exceeds $1 million; and 3) those policyholders who were issued policies in 1995 by Prudential Select Life Insurance Company of America. Stipulation of Settlement at 13.

16

The class included approximately eight million Prudential policyholders who own or owned approximately 10.7 million policies.

a. The Alternative Dispute Resolution process

Under the ADR process contained in the proposed settlement, class members who believed they had been misled could submit a claim to Prudential. The claim form provided to all potential class members contained both narrowly drawn questions designed to elicit information relating to specific evidentiary scoring criteria established under the settlement, as well as more open-ended questions allowing claimants to explain the exact nature of their claims. Claimants were also asked to submit any supporting documents in their possession. Prudential established a toll-free hotline to allow claimants to speak to a Claimant Support team, whose members are specially trained to answer policyholder inquiries, assist with filling out claim forms, and advise them with respect to the collection of supporting documents. Once the claim form was submitted, Prudential was obligated to locate all of its records pertaining to the claim and submit them for consideration.

Once a claim has been filed and all the relevant materials gathered, the claim is subject to a four tier review process. At the first level, the claim would be examined by a member of the Claim Evaluation Staff, who will apply a set of specific criteria for each of four general categories of sales complaints: (1) financed insurance (taking a loan against an existing policy in order to pay the premiums on a new policy); (2) abbreviated payment plans (using dividends from a policy to pay the premiums on that policy); (3) life insurance sold as an investment; and (4) other improper sales practices.[17] Based on the application of the established criteria, the reviewers then assign a score from zero to 3 to each claim.[18] The Claim Evaluation Staff is

_____

17. The financed insurance criteria include an assessment of Prudential's conformity with state replacement laws.

18. The scoring system set forth in the Stipulation of Settlement is as follows:

17

comprised of specially trained Prudential employees who
are not associated with Prudential's individual life
insurance sales force.

Any claim not receiving a score of "3" will automatically
be reviewed by a team of independent claim evaluators who
are selected by class counsel and representatives of the
state regulators. This team will apply the same criteria as
the Claim Evaluation Staff, and make a written
recommendation if it believes the claimant's score should
be adjusted.

That recommendation is then examined by a member of
the Claim Review Staff, which is comprised of Prudential
employees who have not worked as or had supervisory
authority over Prudential sales agents. The determination of
the Claim Review Staff may not be appealed by Prudential.
The claimant, however, may appeal the decision to the

---

- A score of "3" is assigned in the event that either (i) Company
Documentation expressly supports the Misstatement, or (ii) the
Agent Statement confirms the Claimant's allegation of the
Misstatement and this confirmation is not undermined by Available
Evidence.

- A score of "2" is assigned in the event that the alleged
Misstatement is not expressly in writing and the Agent Statement
denies the allegations, but (i) Available Evidence, on balance,
supports the Claimant's allegation of the Misstatement, or (ii) the
Agent has a Complaint History.

- A score of "1" is assigned in the event that the alleged
Misstatement is not expressly in writing and the Agent Statement
denies the allegation, and Available Evidence, on balance, neither
supports nor undermines the Claimant's allegation of the
Misstatement.

- A score of "0" is assigned in the event that Available Evidence
exists which undermines the Claimant's allegation of the
Misstatement and suggests that no Misstatement occurred.

- A score of "N/A" is assigned in the event that the Claim
Resolution
Factor is "not applicable" to the Claim submitted.

Prudential Alternative Dispute Resolution Guidelines, Stipulation of
Settlement, Ex. B, at 9.

18

fourth level of review, the Appeals Committee. The Appeals Committee is selected by class counsel and representatives of the state regulators from a list agreed upon by class counsel, the state regulators, and Prudential. While the Appeals Committee must apply the same criteria, its review of the claim is de novo.[19]

The relief afforded a claimant varies depending on the final score he or she is awarded. Those obtaining a score of zero are afforded no relief. Those with a score of "1" may obtain relief only through Basic Claim Relief. Those with scores of "2" or "3" are entitled to compensatory relief.[20]

_____

19. During this phase of the review, claimants may receive cost-free representation from a representative selected by class counsel and approved by the state regulators. The claimant is entitled to a full rehearing if the representative determines that a "manifest injustice" has occurred.

20. Under the Stipulation of Settlement, the following relief is available based on the category of claim proven:

> Financed Insurance – The policyholder may obtain a refund of the loans, dividends, or values improperly used, with interest in some cases. The policyholder also may be entitled to cancel the "new" policy and get back some or all of the premiums paid, with interest in some cases.

> Abbreviated Payment – The policyholder may be permitted to cancel the policy `and obtain a refund of some or all of the premiums paid, with interest in some cases. Alternatively, the policyholder may be permitted to keep the policy without having to make any additional out-of-pocket payments for some or all of the premiums due.

> Investment Product – The policyholder may be allowed to cancel the policy and obtain a refund of some or all of the premiums paid, with interest in some cases. Alternatively, the policyholder may be able to exchange the policy for an annuity.

> Other Claims – If a policyholder was misled in some other way, the policyholder may be allowed to cancel the policy and obtain a refund of some or all of the premiums paid, with interest in some cases, or may be able to use the refund to purchase another policy.

Fairness Opinion, 962 F. Supp. at 490 (citing February 1, 1997 Notice at 7-8).

b. Basic Claim Relief

Basic Claim Relief allows the class member to obtain one
or more forms of relief without having to demonstrate
liability on Prudential's part. The available forms of Basic
Claim Relief include: (1) low interest loans to help policy
holders make premium payments on existing policies; (2)
enhanced value policies which allow members to purchase
new policies with additional coverage paid for by Prudential;
(3) deferred annuities enhanced by contributions from
Prudential; and (4) the opportunity to purchase shares in
designated mutual funds enhanced by a contribution from
Prudential.

c. Enhancements To the Task Force Plan

The district court found the settlement improved upon
the Task Force's remediation plan in several ways. Fairness
Opinion, 962 F. Supp. at 492-95. First, the court found
that the settlement improved the structure of the ADR
process by including class counsel and their
representatives in the monitoring process, and improving
the claim scoring criteria[21] and evidentiary factors used to
analyze ADR claims.[22] It also enhanced the remedies

_____

21. The district court noted several improvements to the Settlement's
ADR process that would enhance the ability of a policyholder to establish
the presumption that he or she was misled. These enhancements to the
ADR process were:

    (1) Provided that boilerplate statements in policy illustrations
and
    contracts explaining that the dividends, interest or investment
    returns are "not guaranteed" or "non-guaranteed," will not
    independently undermine a claim;

    (2) Reduced from six complaints to three the number of policyholder
    complaints against an agent which would entitle a claimant to a
    score of at least "2"; and

    (3) Extended the period during which policyholder complaints would
    be considered from July 9, 1996 to February 1, 1997.

Fairness Opinion, 962 F. Supp. at 492.

22. The district court also noted the proposed settlement "include[d]
significant improvements in the factors and evidentiary considerations

20

available through both the ADR process and Basic Claim
Relief,23 and provided for a blanket waiver of statute of
_____

used to evaluate claims." Fairness Opinion, 962 F. Supp. at 492. The
court found that the settlement enhanced the Task Force ADR plan by:

      (1) Allowing a claimant's score to be raised if documents
originally
      kept by Prudential that could affect the scoring have improperly
      been destroyed and no copies can be located;

      (2) Allowing the claimant's score for "churning" to be raised if
12%
      of the selling agent's total sales were "financed insurance" sales,
as
      opposed to a threshold figure of 15% under the Task Force plan;

      (3) Allowing a claimant's score to be raised if blank, unsigned
      disbursement forms were used without the policyholder's consent;

      (4) Allowing a claimant's score to be raised for "vanishing
premium"
      claims if an agent used the phrases "vanishing premium" or
      "vanishing point" in writing in connection with the sale of the
policy
      at issue;

      (5) Removing as a negative consideration the fact that a policy
      lapsed prior to the date when the premiums were to "vanish", if it
      appears that the policyholder became aware, prior to the
      misrepresented "vanish" date, that the policy would not perform as
      illustrated;

      (6) Requiring Prudential to contact agents regarding policies they
      sold to obtain additional information about the sale of the policy,
      and to encourage honest responses by agreeing not to take
      disciplinary action against an agent based on his or her truthful
      statements;

      (7) Removing Prudential from its co-equal role with the regulators
in
      the selection of a representative to advocate on behalf of the
      claimant at the arbitration level, and eliminating the $10 million
cap
      on the funding the representative could receive; and

      (8) Creating an entirely new position, the "Claimant
Representative,"
      selected by Class Counsel and responsible for overseeing the entire
      process on behalf of the claimant, including the initial claim
review.

Id. at 492-93.

23. The enhancements to the ADR remedies were:

        (1) The settlement provided 100% interest to claimants scoring a "2"

        or a "3" in the ADR process (compared to the Task Force plan,

21

limitations and other defenses which Prudential might
otherwise have.

Second, it provided minimum financial guarantees which
were not contained in the Task Force plan. In addition to
the uncapped relief provided under both the Task Force
plan and the proposed settlement, Prudential guaranteed to
pay at least $260 million for each 110,000 claims remedied
(up to 330,000), with a minimum payment of $410 million
regardless of the number of claims remedied. Prudential
also agreed to pay an additional remediation amount based
on a sliding scale from $50 to $300 million, depending on
the number of claims remedied. This amount was to be
allocated by the district court.

_____

          which provided zero interest for scores of "2"), and allows
rescission
          of the policy and a refund of the premiums, with interest;

          (2) The settlement allowed a claim receiving a either a "2" or a
"3"
          to receive relief where a policy lapsed before the claimant died,
as
          opposed to the requirement under the Task Force plan that a
          claimant receive a "3." three.

          (3) Full compensatory relief for a vanishing premium claim where a
          Prudential agent promised the claimant would have a"paid up"
          policy;

          (4) Removal of the exclusion in the Task Force plan which prevented
          claims on behalf of the decedent where the policyholder/decedent
          died while the policy was in force.

Fairness Opinion, 962 F. Supp. at 493-94.

The court found that the settlement enhanced the Basic Claim Relief
by:

          (1) Eliminating fifty basis points on Optional Premium Loans;

          (2) Increasing Prudential's contributions to the annual premiums
for
          Enhanced Value Policies;

          (3) Increasing Prudential's contributions toward the purchase price
          of Enhanced Value Annuities;

          (4) Creating a new form of Basic Claim relief known as Mutual Fund
          Enhancements, for which Prudential would contribute 4% of the
          initial purchase price to the fund, up to a maximum of $2,000.

Id. at 494.

Finally, the district court noted the "Proposed Settlement establishe[d] an unparalleled outreach program to ensure that class members are adequately informed." Fairness Opinion, 962 F. Supp. at 492. This included mailing individual notice to over 8 million current and former policyholders, and publishing summary notices in the national editions of The New York Times, The Wall Street Journal, USA Today, and The Newark Star Ledger. The summary notice was also published in the largest newspaper in each of the fifty states and the District of Columbia. In addition, the Stipulation of Settlement provided that, following final approval of the settlement, post-settlement notice would be (a) mailed to each class member, (b) published in the national editions of The New York Times, The Wall Street Journal, USA Today, The Newark Star Ledger, and other regional newspapers, and (c) disseminated through television and radio advertising "on stations having representative regional coverage." Stipulation of Settlement at 27-29. Finally, the outreach program established a six-day-a-week toll-free "800" number, staffed by specially trained personnel, to answer class member questions.24 The Task Force plan did not describe how its outreach program would be implemented. Fairness Opinion, 962 F. Supp. at 494.

### 2. The Fairness Hearing

The district court held the fairness hearing on February 24, 1997.25 At that time the court heard oral argument from all parties who requested the opportunity to speak, including objectors. The district court also permitted appearances by several states and allowed the California Insurance Commissioner and the Florida Insurance Commissioner to appear as amicus curiae. The court allowed the Massachusetts Insurance Commissioner, the Massachusetts Attorney General and the Texas Insurance

_____

24. At oral argument, Lead Counsel noted that approximately 1.8 million phone calls had already been processed. Tr. of Oral Argument, January 26, 1998, at 125 (Testimony of Melvyn Weiss).

25. The district court postponed the hearing date, originally set for January 21, 1997, in order to allow policyholders more time to respond to the class notice and to provide the parties more time to prepare.

Commissioner to intervene under Rule 24(b). The New Jersey Department of Insurance appeared informally as amicus curiae, on its own behalf and on behalf of the Multi-State Life Insurance Task Force.

961<!>Before the fairness hearing, Prudential reached agreements with the remaining state objectors – California, Florida, Texas and Massachusetts – whereby several enhancements were made to the Proposed Settlement. Among those were an automatic score of "3" where a claimant had a life insurance application containing an unauthorized signature, and consideration as one of the scoring criteria the fact that a claimant was over the age of sixty at the time of sale.26 These enhancements were subsequently incorporated into the settlement and made available to all claimants. Fairness Opinion, 962 F. Supp. at 473.27 The district court also took notice that these four

_____

26. The district court noted five enhancements which resulted from the negotiations between the state regulators and Prudential. These were:

> (1) The extension of the complaint history cut-off until February 1,
>
> 1997;
>
> (2) An increase in the interest paid on claims receiving a score of "2"
>
> from 50% to 100%;
>
> (3) The addition of an evidentiary criterion allowing the claim evaluator to consider that a claimant was 60 years or older at the time of the sale;
>
> (4) The addition of a claim resolution factor awarding an automatic score of "3" if a claimant's life insurance application contained an
>
> unauthorized signature; and
>
> (5) The requirement that Prudential provide claimants, at the claimants request, with current account information, such as outstanding loans, dividend payments and "currently illustrated year of abbreviation."

Fairness Opinion, 962 F. Supp. at 498.

27. Krell disputes this finding, and argues that the additional enhancements benefitted only the citizens of those four states. Krell Brief at 47 n.56. Krell's argument relies primarily on its assertion that Florida residents received better notice and were benefitted by more favorable

evidentiary presumptions, including a more favorable definition of replacements. Id.; see also Krell Reply Brief at 49–51. Lead Counsel

24

states received, in addition to the negotiated enhancements, additional fines and penalties from Prudential which were paid to the states, and not to aggrieved policyholders.

On March 7, 1997 the able district court issued a summary Memorandum Opinion and Order certifying the class and approving the settlement as fair and reasonable, and ten days later filed a lengthy (almost 250 pages) and thorough opinion explaining its decision.

## II. ISSUES RAISED ON APPEAL AND STANDARDS OF REVIEW

Appellants principally challenge five distinct elements of the settlement. First, they raise the threshold issue whether the district court had jurisdiction over this class action.

_____

responds that the court was correct to rely on Prudential's statements in open court to the effect that the enhancements would be available to all class members. Lead Counsel Brief at 58. Additionally, Lead Counsel notes that the district court found the settlement was fair and reasonable even without the state-negotiated enhancements. Id.

We disagree with Krell. At the Fairness Hearing on February 24, 1997, Krell raised his concern regarding the state-negotiated enhancements. Prudential explained that "the ADR plan changes that were agreed to with the four states in terms of modifications of scoring and relief will be made available nationally through the class settlement." Tr. of Fairness Hearing at 141. An examination of the settlements signed by the four objecting states and the Amendment to Stipulation of Settlement filed by the settling parties supports the district court'sfinding. Also, while Prudential's explanation does not specifically respond to Krell's assertion that Florida residents received enhanced notice, we do not believe this is significant. As discussed infra, we find the notice provided under the settlement was adequate, and it is not rendered inadequate by any additional notice provisions negotiated by an individual state. Finally, Krell's argument with respect to replacement claims misses the mark. As Prudential explained at the hearing, the "scoring enhancements [in the ADR process] where there was a violation of state regulations on replacement will be based on each states' individual replacement regulations where the policy was sold . . . [t]he Florida provision is confirmatory and expands what is already in the plan." Tr. of Fairness Hearing at 174. Thus, any provision negotiated by Florida regarding the definition of replacement is based on Florida law and is not applicable to other states.

25

Second, they challenge the court's certification of the settlement class. Third, they contest the district court's order approving the proposed settlement as fair and reasonable. Fourth, appellants take issue with the district court's $90 million award of attorneys' fees. Finally, they once more take aim at the district court's handling of this case, appealing the denial of their motion to disqualify under 28 U.S.C. SS 455(a), 455(b)(1) and 455(b)(5)(iv).

"The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975). Consequently, we will reverse the district court "for a clear abuse of discretion." Id. at 156 n.7. In addition, the certification of a class and the award of reasonable attorneys' fees are also subject to an abuse of discretion standard. In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 782 (3d Cir. 1995) ("G.M. Trucks"). "An appellate court may find an abuse of discretion where the `district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.' " Id. at 783 (quoting International Union, UAW v. Mack Trucks, Inc., 820 F.2d 91, 95 (3d Cir. 1987)). Our review of jurisdictional issues, however, is plenary. Anthuis v. Colt Indus. Operating Corp., 971 F.2d 999, 1002 (3d Cir. 1992).

III. JURISDICTION

The Krell and Johnson appellants contend the district court lacked subject matter jurisdiction over most of the class, including objectors. Additionally, they contend that there is no Article III "case or controversy" with respect to the class claims, and that the court's exercise of supplemental jurisdiction was improper.

A. Subject Matter Jurisdiction

As an initial matter, the district court found it had subject matter jurisdiction over the named plaintiffs in this class action. In particular, the court found it had both federal question jurisdiction and diversity jurisdiction over the class, as well as supplemental jurisdiction under 28 U.S.C. S 1367. Fairness Opinion, 962 F. Supp. at 500.

26

The district court found exclusive federal question jurisdiction under 28 U.S.C. S 1331 based on the claims of named plaintiff Dorfner. Dorfner alleged violations of the federal securities laws, in particular Sections 10(b) and 20(a) of the Securities and Exchange Act, and Rule 10b-5 promulgated thereunder. In addition, approximately 30% of the policies at issue were registered securities, and thus fell within the court's federal question jurisdiction. The district court also found it had diversity jurisdiction over each of the named plaintiffs under 28 U.S.C. S 1332. All named plaintiffs were residents of different states from the defendants named in the complaint. Additionally, the named plaintiffs have each alleged more than $50,000 in losses as a result of Prudential's fraudulent scheme, and thus meet the "amount-in-controversy" requirement in effect at the time the complaint was filed.[28]

The primary jurisdictional objection raised on appeal relates to the district court's assertion of supplemental jurisdiction over the absentee class members on the basis of 28 U.S.C. S 1367. The court found that all of the class claims are "inextricably factually intertwined" because they are all "premised upon a common course of conduct by Prudential . . . relat[ing] to the same alleged company wide development and implementation of the patently fraudulent sales techniques." Fairness Opinion, 962 F. Supp. at 501. Noting that S 1367 applies to both pendent parties and pendent claims, the district court concluded it had the discretion to exercise supplemental jurisdiction over the entire dispute and the proposed settlement on the basis of its initial federal question jurisdiction. The court also found it could exercise supplemental jurisdiction over the state claims on the basis of its diversity jurisdiction. Id. at 505.

Appellants dispute both of these asserted grounds for supplemental jurisdiction. They contend the federal claims of plaintiff Dorfner, the claims of persons with purely state law claims, and the panoply of "other" sales claims do not

_____

28. The 1996 Amendment to 28 U.S.C. S 1332, which raised the amount-in-controversy requirement from $50,000 to $75,000, did not take affect until after the filing of the Second Amended Consolidated Complaint. See Pub. L. No. 104-317, S 205(b) (1996).

derive from a common nucleus of operative fact, and thus the district court cannot exercise supplemental jurisdiction based on its jurisdiction over plaintiffs' federal securities claims.29 Johnson Brief at 4. Appellants also contest the district court's assertion of supplemental jurisdiction based on its initial diversity jurisdiction. They contend that, in order for the district court to exercise supplemental jurisdiction, each putative class member must meet the amount-in-controversy requirement of S 1332. Johnson Brief at 7-8 (citing Zahn v. International Paper Co., 414 U.S. 291 (1973)). Finally, appellants argue the district court's application of 28 U.S.C. S 1367 to assert jurisdiction over the proposed class violates Article III.

The settling parties respond with two arguments. First, they claim the district court correctly exercised supplemental jurisdiction based on its original federal question jurisdiction because all class members' claims arise from the same case or controversy. Thus there is no need to address the question of the district court's diversity jurisdiction. In the alternative, they argue that appellants' reliance on Zahn is misplaced, and thatS 1367 overruled Zahn's requirement that all class members meet the amount-in-controversy requirement of S 1332. Consequently, the court could properly exercise supplemental jurisdiction based on its original diversity jurisdiction.

> 1. Federal Question Jurisdiction as a Basis fo r
>    Supplemental Jurisdiction

None of the parties contest the district court's assertion of federal question jurisdiction "over [plaintiff] Dorfner's federal securities claims, and the federal securities claims of other similarly situated plaintiffs." Fairness Opinion, 962 F. Supp. at 500. Instead they focus their arguments on the court's exercise of supplemental jurisdiction.

Before enactment of S 1367, a district court could only exercise jurisdiction over claims which did not satisfy the requirements of SS 1331 and 1332 by applying the

_____

29. They also argue that Dorfner could not be expected to bring both his federal claims and his purely state law claims in the same suit.

28

principles of ancillary or pendent jurisdiction. The concept of pendent jurisdiction, as explained by the Supreme Court in United Mine Workers v. Gibbs, 383 U.S. 715 (1966), allowed a court to hear non-federal claims over which it did not have diversity jurisdiction provided those claims shared a "common nucleus of operative fact" with the claims that supported the court's original jurisdiction. But this extension of jurisdiction was permitted only when it would promote "judicial economy, convenience and fairness to litigants." 383 U.S. at 726.

While pendent jurisdiction allowed district courts to hear additional, non-federal claims which were part of the same "case" as those claims within the court's original jurisdiction, the doctrine of ancillary jurisdiction allowed courts to hear claims brought against additional parties. Ancillary jurisdiction, however, was more limited than its counterpart. In Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365 (1978), the Court held ancillary jurisdiction could not be asserted when to do so was contrary to the rule of complete diversity. Further, the Court found the doctrine of ancillary jurisdiction did not allow the addition of parties who were not within the court's original jurisdiction, even in cases in which the district court had exclusive federal jurisdiction. Finley v. United States, 490 U.S. 545 (1989). But the Finley Court noted the cases addressing the scope of ancillary and pendent jurisdiction were not entirely consistent, and offered the possibility that "[w]hatever we say regarding the scope of jurisdiction conferred by a particular statute can of course be changed by Congress." Id. at 556.

Congress responded by passing the Judicial Improvements Act of 1990, which added S 1367 to the jurisdictional arsenal of the federal courts and essentially overruled Finley. Section 1367 combined the two concepts of pendent and ancillary jurisdiction under the rubric of "supplemental" jurisdiction, providing for jurisdiction "in any civil action of which the district courts have original jurisdiction" over "all other claims that are so related . . . that they form part of the same case or controversy under Article III." 28 U.S.C. 1367(a). The statute explicitly included "claims that involve the joinder or intervention of additional parties." Id.

29

The enactment of S 1367 has elicited a strong reaction from legal scholars. Some have argued that Congress intended S 1367 to be interpreted broadly, and hoped to encourage the federal courts to hear claims which might otherwise have fallen outside of their reach. See John B. Oakley, Recent Statutory Changes in the Law of Federal Jurisdiction and Venue: The Judicial Improvements Acts of 1988 and 1990, 24 U.C. Davis L. Rev. 735, 766 (Spring 1991) ("By the juxtaposition of sections 1367(a) and 1367(c) Congress appears to have created a strong presumption in favor of the exercise of supplemental jurisdiction."); 2 Herbert B. Newberg and Alba Conte, Newberg on Class Actions, S 6.11, at 6-45 (3d ed. 1992) ("[T]here are multiple reasons to expect that the rulings of Zahn v. International Paper Co., requiring allegations that each class member satisfied jurisdictional amount requirements in diversity actions, have been legislatively bypassed."). Others have felt that S 1367 is constrained by prior Supreme Court decisions, and does not expand the courts' jurisdictional grant. Thomas D. Rowe, Jr., Stephen B. Burbank & Thomas M. Mengler, Compounding or Creating Confusion About Supplemental Jurisdiction? A Reply to Professor Freer, 40 Emory L.J. 943, 960 n.90 (Fall 1991) (acknowledging that while a facial construction of S 1367 would appear to overrule Zahn, "the legislative history was an attempt to correct the oversight"); Denis F. McLaughlin, The Federal Supplemental Jurisdiction Statute – A Constitutional And Statutory Analysis, 24 Ariz. St. L.J. 849, 973 (Fall 1992)("[Section] 1367 should be interpreted as effecting no change in the prior practice and continuing undisturbed the rule of Zahn."). Regardless of Congress's intent with respect to Zahn, it is clear that S 1367 does not abrogate the rule of law established in Gibbs, and thus any exercise of supplemental jurisdiction must meet the requirements of Article III's "case or controversy" standard. See H.R. Rep. No. 101-734 at n.15 (1990), reprinted in 1990 U.S.C.C.A.N. 6860, 6875 n.15 (stating that S 1367(a) "codifies the scope of supplemental jurisdiction first articulated by the Supreme Court in United Mine Workers v. Gibbs"); New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc., 101 F.3d 1492, 1505 (3d Cir. 1996) ("The Supreme Court delineated the modern constitutional bounds of

pendent [now referred to as supplemental] jurisdiction in United Mine Workers v. Gibbs."); Oakley, 24 U.C. Davis L. Rev. at 764 (noting that under S 1367, the district court's exercise of supplemental jurisdiction "extends to the limits of Article III, thus ratifying and incorporating the constitutional analysis of United Mine Workers v. Gibbs").

There is no dispute the district court had jurisdiction over the federal securities claims alleged in the Second Amended Consolidated Complaint. Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987) (citing Gully v. First National Bank, 299 U.S. 109, 112-113 (1936)) ("The presence or absence of federal-question jurisdiction is governed by the `well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff 's properly pleaded complaint."). It is equally clear that, under S 1367, the district court could exercise supplemental jurisdiction over any claims which were part of the same Article III "case or controversy" as the federal securities claims. Consequently, our analysis turns on whether the claims asserted in the Second Amended Consolidated Complaint meet the standard established in Gibbs.

Under Gibbs, three requirements must be met for a court to exercise supplemental jurisdiction:

> The federal claims must have substance sufficient to confer subject matter jurisdiction on the court. The state and federal claims must derive from a common nucleus of operative fact. But if considered without regard to their state or federal character, a plaintiff 's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in the federal courts to hear the whole.

383 U.S. at 725 (emphasis omitted) (footnote and internal citation omitted).

A district court may not assert supplemental jurisdiction over state claims that are totally unrelated to the federal claims that form the basis of the court's jurisdiction. Lyon v. Whisman, 45 F.3d 758, 761 (3d Cir. 1995). In Lyon, the district court had original jurisdiction to hear claims under

31

the Fair Labor Standards Act, and elected to exercise supplemental jurisdiction over state contract and tort claims. The federal claim involved the employer's failure to pay overtime wages, while the state claims related to a failure to pay certain bonuses. This Court ruled that the exercise of supplemental jurisdiction was inappropriate, because the only nexus between the state and federal claims was the employer/employee relationship, rather than the conduct underlying the claims.30  Id. at 764.

The Second Amended Consolidated Complaint alleges that Prudential engaged in a widespread scheme to defraud customers. As part of that scheme, Prudential allegedly used "false and misleading sales presentations, policy illustrations, marketing materials, and other information approved, prepared and disseminated by Prudential to its nationwide sales force. Second Amended Consolidated Complaint at 3. According to plaintiffs, certain actions taken by Prudential in furtherance of that scheme violated S 10(b)31 and S 20(a)32 of the Securities and ExchangeAct.

_____

30. The Lyon court found that "under any standard, the nexus between the federal and state claims in this case is inadequate" to support supplemental jurisdiction. 45 F.3d at 762. The court went on to note:

> Lyon's FLSA claim involved very narrow, well-defined factual issues about hours worked during particular weeks. The facts relevant to her state law contract and tort claims, which involved Whisman's alleged underpayment of a bonus and its refusal to pay the bonus if Lyon started looking for another job, were quite distinct. In these circumstances it is clear that there is so little overlap between the evidence relevant to the FLSA and state claims, that there is no "common nucleus of operative fact" justifying supplemental jurisdiction over the state law claims. In fact, it would be charitable to characterize the relationship of the federal and state claims as involving even a "loose" nexus.

Id. at 763.

31. Section 10(b) of the Securities Exchange Act of 1934 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--

* * *

As noted, the district court agreed with the settling parties, finding that all of the class claims were "inextricably intertwined" because there was a common scheme to defraud.33

We agree. The Second Amended Consolidated Complaint clearly alleges that Prudential engaged in a common scheme to defraud. Each category of claims raised in the Complaint relied on the implementation of that scheme, the training of Prudential's agents in conformity with it, and the use of pre-approved materials to support it. While only one category of claims alleged in the Complaint involved violations of the federal securities laws, all of the claims derive from the same common scheme, and thus from the same "nucleus of operative fact." That implementation of Prudential's scheme resulted in a variety of unlawful transactions does not negate the common basis they all shared. We recognize the need to scrutinize assertions of federal subject matter jurisdiction in these kinds of class

_____

        (b) To use or employ, in connection with the purchase or sale of any
        security registered on a national securities exchange or any security
        not so registered, any manipulative or deceptive device or
        contrivance in contravention of such rules and regulations as the
        Commission may prescribe as necessary or appropriate in the public
        interest or for the protection of investors.

15 U.S.C. S 78j(b).

32. Section 20(a) of the Securities Exchange Act of 1934 provides:

        Every person who, directly or indirectly, controls any person liable
        under any provision of this chapter or of any rule or regulation
        thereunder shall also be liable jointly and severally with and to the
        same extent as such controlled person to any person to whom such
        controlled person is liable, unless the controlling person acted in
        good faith and did not directly or indirectly induce the act or acts
        constituting the violation or cause of action.

15 U.S.C. S 78t(a).

33. Furthermore, many plaintiffs had more than one claim stemming from the conduct of Prudential's sales agents. For example, named plaintiff Nicholson alleged churning, vanishing premium and investment plan claims, while named plaintiff Dorfner alleged churning and vanishing premium claims. See supra note 11.

actions where there are significant state law claims. But we believe the nexus between the federal and state claims is so close here that federal jurisdiction is appropriate. Consequently, we hold the district court properly exercised supplemental jurisdiction over the class members' state claims based on its federal question jurisdiction.

Of course, S 1367 does not permit courts to take jurisdiction over tangentially related claims. The issue is whether there is a "common nucleus of operative fact" and whether the claims are part of the "same case or controversy under Article III." Here the facts underlying the investment deception are so intertwined with the other misrepresentations and frauds that, given the allegations of the overall scheme, they have the same factual predicate, making extension of federal jurisdiction appropriate.

> 2. Diversity Jurisdiction as a Basis for Supplemen tal
> Jurisdiction

The district court also found that it had supplemental jurisdiction under S 1367 based on its original diversity jurisdiction over named plaintiffs' claims underS 1332. As noted, the named plaintiffs satisfy the prerequisites for diversity jurisdiction. None of the named plaintiffs is a citizen of the same state as any defendant, satisfying the complete diversity requirement, and each of the named plaintiffs has alleged damages in excess of $50,000, satisfying the amount in-controversy requirement. The more perplexing question is whether the remaining class members must also satisfy the requirements of diversity jurisdiction in order for the court to exercise supplemental jurisdiction over their claims.

Before enactment of S 1367, absentee class members seeking to establish the court's subject matter jurisdiction based on diversity of citizenship were not subject to the same requirements as the class representatives. According to the Supreme Court, the complete diversity requirement did not apply to absentee class members, but was satisfied so long as the named plaintiffs were completely diverse from defendants. Supreme Tribe of Ben Hur v. Cauble, 255 U.S. 356, 365-67 (1921). But the absentee class members

34

were each subject to the same amount-in-controversy requirement as the named plaintiffs, and could not aggregate their claims in order to satisfy S 1332. Zahn, 414 U.S. at 301.

Although the complete diversity rule of Supreme Tribe of Ben-Hur remains intact, the passage of S 1367 has raised serious questions about the continuing viability of Zahn. On the one hand, it is generally conceded that the plain language of S 1367 states a different amount-in-controversy rule from that set forth in Zahn.34 See, e.g., Russ v. State

_____

34. Section 1367 provides:

> (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

> (b) In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiff under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--

> (1) the claim raises a novel or complex issue of State law,

> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. S 1367.

Farm Mut. Auto. Ins. Co., 961 F. Supp. 808, 817-20 (E.D. Pa. 1997). Section 1367(a) gives courts discretion to exercise supplemental jurisdiction in all cases where the original claim supporting federal jurisdiction and the additional claim are part of the same Article III case or controversy, including those additional claims involving the joinder of parties. At the same time, S 1367(b) establishes certain exceptions to this permissive rule in cases where the court's original jurisdiction is based solely on diversity. In particular, S 1367(b) prohibits federal courts from exercising supplemental jurisdiction over persons made parties under Rules 14, 19, 20, and 24, unless those additional claims independently satisfy S 1332. Under the principle of expressio unius est exclusio alterius, Congress's failure to include Rule 23 among the restrictions in subsection (b) would seem to indicate Congress did not intend to restrict the district court's exercise of supplemental jurisdiction in class actions. In addition, Zahn's critics contend that, from a policy standpoint, the decision runs counter to Supreme Tribe of Ben-Hur. They argue that while the complete diversity requirement upholds the very essence of diversity jurisdiction, the amount-in-controversy requirement is merely an administrative concept designed to limit the caseload of the federal judiciary. Consequently, they contend it would make little sense to create an exception to complete diversity in the context of class actions but to continue requiring all class members to meet the amount-in-controversy requirement. See Zahn, 414 U.S. at 309 (Brennan, J. dissenting) ("Particularly in view of the constitutional background on which the statutory diversity requirements are written, it is difficult to understand why the practical approach the Court took in Supreme Tribe of Ben-Hur must be abandoned where the purely statutory `matter in controversy' requirement is concerned.").35

_____

35. It is interesting to note that one of the primary rationales for class actions is allowing access to the courts for parties whose individual claims are so small that it would be economically infeasible to pursue them individually. See 1 Herbert Newberg & Alba Conte, Newberg on Class Actions S 4.27 at 4-107 to 4-109 (3d ed. 1992). Consequently, upholding Zahn's amount-in-controversy requirement would largely undercut this purpose.

36

By contrast, others contend S 1367 was never intended to eliminate the amount-in-controversy requirement for 661<!>absentee class members established in Zahn. This

argument relies heavily on the legislative history of the statute, in particular the House Judicial Committee Report that explicitly states S 1367 "is not intended to affect the jurisdictional requirements of 28 U.S.C. S 1332 in diversity-only class actions, as those requirements were interpreted prior to Finley." H.R. Rep. No. 101-734 at 29 (1990), reprinted in 1990 U.S.C.C.A.N. 6860, 6875 (footnote omitted). The footnote to this section of the Report specifically refers to Supreme Tribe of Ben-Hur and Zahn, and supports the argument that the complete diversity and amount-in-jurisdiction rules of those cases survive the enactment of S 1367. Additionally, the Report of the Federal Courts Study Committee urges Congress to "expressly authorize federal courts to hear any claim arising out of the same `transaction or occurrence' as a claim within federal jurisdiction, including claims, within federal question jurisdiction, that require the joinder of additional parties, namely, defendants against whom that plaintiff has a closely related state claim." Report of the Federal Courts Study Committee 47 (1990) (quoted in Russ, 961 F. Supp. at 815). The limited scope of the Committee's suggestion can be read as support for upholding the restrictions of Zahn.36

The cases addressing this issue reflect this difference of opinion. The only two appellate courts to examine this question have both found the language of the statute

_____

36. The Federal Courts Study Committee Working Papers showed that the matter had come to the attention of the Committee. 1 Federal Courts Study Committee Working Papers and Subcommittee Reports 561 n.33 ("From a policy standpoint, [Zahn] makes little sense, and we therefore recommend that Congress overrule it."). Nonetheless, the Committee did not adopt the proposal and, indeed, cautioned against reliance on the Working Papers. See Preface to Working Papers ("These [Working Papers] were valued background materials which the Committee determined should be published for general consideration whether or not the Committee agreed with their substantive proposals. . . . In no event should the [Working Papers] be construed as having been adopted by the Committee.").

controlling, and concluded that S 1367 overrules Zahn. See In re Abbott Laboratories, 51 F.3d 524, 528 (5th Cir. 1995); Stromberg Metal Works v. Press Mechanical, Inc., 77 F.3d 928, 930 (7th Cir. 1996). The Abbott Laboratories court reasoned that it could not "search legislative history for congressional intent unless [it found] the statute unclear or ambiguous," and that in the absence of such ambiguity "the statute is the sole repository of congressional intent." 51 F.3d at 528-9 (citing United States v. X-Citement Video, Inc., 513 U.S. 64, 68-71 (1994); West Virginia Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 99-100 (1991)). Because it found the plain language of the statute unambiguous, the court concluded that "under S 1367 a district court can exercise supplemental jurisdiction over members of a class, although they did not meet the amount-in-controversy requirement, as did the class representatives." Id. at 529.

Unlike the class action facing the court in Abbott Laboratories, the Court of Appeals for the Seventh Circuit addressed this question in the context of two plaintiffs seeking to join an additional claim that did not meet the amount-in-controversy requirement. Stromberg, 77 F.3d at 930. The Stromberg court also reasoned that "[w]hen text and legislative history disagree, the text controls," and allowed the exercise of supplemental jurisdiction in that instance. 77 F.3d at 931 (citing In re Sinclair, 870 F.2d 1340 (7th Cir. 1989)).

Most of the district courts that have addressed this issue have concluded otherwise. These courts have relied primarily on the legislative history to find that Zahn is still good law. See, e.g., Russ, 961 F. Supp. at 817-20; Crosby v. America Online, Inc., 967 F. Supp. 257, 263-64 (N.D. Ohio 1997); Griffin v. Dana Point Condominium Ass'n, 768 F. Supp. 1299, 1301-02 (N.D. Ill. 1991). Judge Louis Pollak's opinion in Russ, while conceding that the plain language of the statute would appear to overrule Zahn, presents a persuasive analysis of the legislative history and the policy reasons supporting his conclusion that Zahn is unaffected by the enactment of the supplemental jurisdiction statute.

The district court here followed the reasoning of Abbott Laboratories and concluded the plain language ofS 1367

overruled Zahn. Consequently, the district court found it also had supplemental jurisdiction over the non-federal claims of absentee class members based on its diversity jurisdiction over the claims of the named plaintiffs.

The question is by no means an easy one. From a policy standpoint, it can be argued that national (interstate) class actions are the paradigm for federal diversity jurisdiction because, in a constitutional sense, they implicate interstate commerce, foreclose discrimination by a local state, and tend to guard against any bias against interstate enterprises. Yet there are strong countervailing arguments that, at least under the current jurisdictional statutes, such class actions may be beyond the reach of the federal courts.

Regardless of the relative strength of the competing arguments over Zahn's continued viability, we need not enter the fray. Because we have found that the district court properly exercised supplemental jurisdiction over class members' non-federal claims based on its original federal question jurisdiction, we need not decide whether the district court properly found it had supplemental jurisdiction based on its exercise of diversity jurisdiction over the claims of the named plaintiffs. The continued viability of Zahn and its effect on class actions will undoubtedly be addressed in the near future, either by the Supreme Court or by Congress, and at present we need not resolve the issue.

B. Personal Jurisdiction

The district court also found it had personal jurisdiction over all members of the proposed class. We agree. In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class. Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811–12 (1985). The combination of reasonable notice, the opportunity to be heard and the opportunity to withdraw from the class satisfy the due process requirements of the Fifth Amendment. Consequently, silence on the part of those receiving notice is construed as tacit consent to the court's

jurisdiction. Id.; see also Carlough v. Amchem Prods., Inc., 10 F.3d 189, 199 (3d Cir. 1993).

The district court here directed that notice of the class action be sent to all persons who owned one or more Prudential insurance policies between 1982 and the present. Initially, we note the provision of individual notice to each class member is by no means typical of the notice provided in most class actions, and certainly qualifies as unprecedented. The notice provided here met the requirements for personal jurisdiction. It explained that each individual receiving notice was a member of the proposed class, and clearly set forth the procedure for opting out of the class. The notice also contained the proposed release, which explained that all claims would be waived if the individual did not elect to opt out of the class. Consequently, we find the members of the proposed class were adequately informed of their potential claims against Prudential, and the district court had personal jurisdiction over those members of the putative class who did not timely opt out.[37]

## C. Article III

Appellants also dispute the district court's finding that this case qualified as a "case or controversy" under Article III. Fairness Opinion, 962 F. Supp. at 505-6. Appellants contend that, "whether analyzed under the feigned case doctrine or as a failure of Article III standing," the inclusion of both injured and uninjured policyholders in the certified class violates the case or controversy requirement of Article III because the parties have not suffered an "injury in fact." Public Citizen Brief at 16. Appellants also contend the inclusion and release of claims arising out of not only the three primary activities complained of, but also based on "other improper sales practices," disqualifies the action as a case or controversy under Article III. Id. at 16-17. Amicus curiae Public Citizen further argues that the record is devoid of information concerning these other improper sales

_____

37. Appellants have questioned whether the notice adequately described the category of "other improper sales practices" claims so as to inform members that they might have a valid, compensable claim against Prudential. We believe it did. See discussion infra S V.C.2.

practices, that no plaintiff has claimed an injury as a result of them, and that there was never an intent to litigate them. Consequently, "there never has been any live controversy between Prudential and the `other improper sales practices' class." Id. at 17. The district court addressed appellants' contentions and found them to be without merit. Fairness Opinion, 962 F. Supp. at 506.

We agree with the district court. Article III requires that federal courts may only adjudicate an actual "case or controversy." As the district court noted, whether an action presents a "case or controversy" under Article III is determined vis-a-vis the named parties. Id. at 506 (citing Allee v. Medrano, 416 U.S. 802 (1974)). "Once threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court, and there remains no further separate class standing requirement in the constitutional sense."1 Newberg on Class Actions S 2.05 at 2-29 (3d Ed. 1992). The record in this case is replete with examples of the adversarial nature of these proceedings, and it is clear that all of the named representatives have a valid "case or controversy" with respect to Prudential's alleged fraudulent sales scheme. There is also ample evidence that each named party has suffered an "injury in fact" as a result of Prudential's sales practices and therefore has standing to bring suit. Thus, the named plaintiffs satisfy Article III. The absentee class members are not required to make a similar showing, because once the named parties have demonstrated they are properly before the court, "the issue [becomes] one of compliance with the provisions of Rule 23, not one of Article III standing." Goodman v. Lukens Steel Co., 777 F.2d 113, 122 (3d Cir. 1985), aff'd, 482 U.S. 656 (1987).

We also note that, with respect to appellants' "feigned case" argument, the notice and the ADR process here were designed to determine which members of the class could demonstrate a compensable injury as a result of Prudential's allegedly deceptive practices. To require the named plaintiffs to determine beforehand which of the 8 million policyholders were deceived and provide notice to only those persons would eliminate the viability of the class action device.

41

We also disagree that the parties never intended to litigate the "other sales practices" claims. As discussed, those claims, along with the three categories of specific violations, were all intertwined as part of the common scheme allegedly employed by Prudential. If the parties litigated the churning, vanishing premium and investment plan claims, they would have litigated their "other sales practice" claims as well.

Based on the foregoing, we will affirm the district court's exercise of jurisdiction.

IV. CLASS CERTIFICATION

A. Settlement-Only Class Certification

Under the Federal Rules of Civil Procedure, a district court generally makes a determination whether to certify a class "as soon as practicable after the commencement of an action brought as a class action." Fed. R. Civ. P. 23(c)(1). This certification may be conditional, and may be modified as needed. Id. Although the initial complaint in this case was filed on October 24, 1995, the district court delayed consideration of the certification issue pending the outcome of the Task Force investigation.38

On October 28, 1996, the district court conditionally certified the proposed class for settlement purposes only. Reviewing the class action device historically, the Supreme Court noted that "[a]mong current applications of Rule 23(b)(3), the `settlement only' class has become a stock device. . . . all Federal Circuits recognize the utility of Rule 23(b)(3) settlement classes." Amchem Prods. Inc. v. Windsor, ___ U.S. ___, 117 S. Ct. 2231, 2247 (1997) (citations omitted); see also G.M. Trucks, 55 F.3d at 786-800 (examining the arguments for and against the use of settlement classes). But drawing on Judge Edward Becker's comprehensive opinion in Georgine v. Amchem Products, Inc., 83 F.3d 610 (3d Cir. 1996),39  the Amchem Court noted

_____

38. As noted above, the district court partially granted Prudential's motion to dismiss on May 10, 1996.

39. The proposed settlement in Georgine was the by-product of ongoing negotiation and litigation involving a group of asbestos manufacturers

the special problems encountered with settlement classes. Although as a general matter it approved the certification of classes for settlement purposes only, the Supreme Court cautioned that the certification inquiry is still governed by Rule 23(a) and (b), and that "[f]ederal courts . . . lack authority to substitute for Rule 23's certification criteria a standard never adopted – that if a settlement is`fair,' then certification is proper." Amchem, 117 S. Ct. at 2248–49.

Consequently, a district court must first find a class satisfies the requirements of Rule 23, regardless whether it certifies the class for trial or for settlement. Amchem, 117 S. Ct. at 2248 ("The safeguards provided by the Rule 23(a) and (b) class-qualifying criteria, we emphasize, are not impractical impediments – shorn of utility – in the settlement class context."); G.M. Trucks, 55 F.3d at 799–800 ("In sum, `a class is a class is a class,' and a settlement class, if it is to qualify under Rule 23, must meet all of its requirements.").

_____

and a myriad of plaintiffs whose cases had been consolidated in the Eastern District of Pennsylvania by the Multidistrict Litigation Panel. Counsel for both sides negotiated separate settlements to resolve both the then-pending claims against the CCR and the inventory of unfiled claims held by plaintiffs' counsel. Once the extant cases were settled, the
parties filed the Georgine class action on behalf of approximately 2 million individuals who had not previously filed lawsuits against the asbestos defendants, but who had been exposed to asbestos products produced by defendants. While some members of the class had suffered physical injuries as a result of their exposure, other members of the class were "exposure-only" plaintiffs who had not yet developed any asbestos-related illness. The parties simultaneouslyfiled a complaint, an answer, a proposed settlement and a joint motion for conditional class certification. The district court granted the motion, and subsequently approved the settlement. On appeal, the Georgine court vacated the district court's opinion and remanded for decertification of the class, finding that the class did not satisfy the typicality, adequacy of representation, predominance and superiority requirements of Rule 23. Georgine, 83 F.3d at 618. The Supreme Court affirmed. Amchem, 117 S. Ct. at 2244.

Throughout this opinion, we will distinguish between the opinions of this Court and the Supreme Court by referring to the Supreme Court's decision as Amchem, and referring to this Court's opinion as Georgine.

The district court may take the proposed settlement into consideration when examining the question of certification. Amchem, 117 S. Ct. at 2248.40 In Amchem, the Supreme Court held "a district court [determining whether to certify a class for settlement purposes only] need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." Id. at 2248. But at the same time the Court noted that "other specifications of the rule – those designed to protect absentees by blocking unwarranted or overbroad class definitions – demand undiluted, even heightened, attention in the settlement context." Id. In particular, the Court emphasized the importance of applying the class certification requirements of Rules 23(a) and (b) separately from its fairness determination under Rule 23(e). The Court noted that "[i]f a common interest in a fair compromise could satisfy the predominance requirement of Rule 23(b)(3), that vital prescription would be stripped of any meaning in the settlement context." Id. at 2249–50.41 At the same time, the Court stressed the requirements found under Rule 23(a), in particular the stricture that"the representative parties will fairly and adequately protect the interests of the class." Indeed, the key to Amchem appears to be the careful inquiry into adequacy of representation. Id. at 2248 ("Subdivisions (a) and (b) [of Rule 23] focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives. That dominant concern persists when settlement, rather than trial, is proposed.")

With this standard in mind, we will review the district court's analysis of the Rule 23 certification criteria.

_____

40. The district court did not have the benefit of the Amchem decision when it rendered its opinion, and did not take settlement into consideration when conducting its certification analysis.

41. In his separate opinion concurring in part and dissenting in part, Justice Breyer, joined by Justice Stevens, questioned the consistency of the majority approach. "If the majority means that these pre-settlement questions are what matters, then how does it reconcile its statement with its basic conclusion that `settlement is relevant' to class certification." Amchem, 117 S. Ct. at 2254.

44

## B. Class Certification under Rule 23

"Rule 23 is designed to assure that courts will identify the common interests of class members and evaluate the named plaintiff 's and counsel's ability to fairly and adequately protect class interests." G.M. Trucks, 55 F.3d at 799. In order to be certified, a class must satisfy the four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.42 If the Rule 23(a) criteria are satisfied, the court must also find that the class fits within one of the three categories of class actions defined in Rule 23(b).43 In this instance the parties sought to certify the class under Rule 23(b)(3).44 In order to pass muster under Rule 23(b)(3),

_____

42. Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

43. Rule 23(b)(1) authorizes certification in cases where separate actions by or against individual class members would risk establishing "incompatible standards of conduct for the party opposing the class," Rule 23(b)(1)(A), or would "as a practical matter be dispositive of the interests" of nonparty class members "or substantially impair or impede their ability to protect their interests," Rule 23(b)(1)(B). Rule 23(b)(2) authorizes class actions seeking declaratory or injunctive relief, for example civil rights cases alleging class based discrimination.

44. Rule 23(b)(3) provides:

> (b) An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

* * *

> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A)

the district court must determine that common questions of law or fact predominate and that the class action mechanism is the superior method for adjudicating the case. The requirements of subsections (a) and (b) are designed to insure that a proposed class has "sufficient unity so that absent class members can fairly be bound by decisions of class representatives." Amchem , 117 S. Ct. at 2248; see also Hassine v. Jeffes, 846 F.2d 169, 177 n.4 (3d Cir. 1988) (" `[C]ommonality' like`numerosity' evaluates the sufficiency of the class itself, and `typicality' like `adequacy of representation' evaluates the sufficiency of the named plaintiff . . . ."). As noted, these class certification requirements are to be determined independently from the court's determination of the "fairness" of the proposed settlement under Rule 23(e).45 Amchem, 117 S. Ct. at 2248 (Rule 23(e) "was designed to function as an additional requirement, not a superseding direction, for the`class action' to which Rule 23(e) refers is one qualified for certification under Rule 23(a) and (b).").

### 1. The Rule 23(a) Criteria

#### a. Numerosity

The court must find that the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P.

_____

the interest of members of the class in individually controlling the
prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the
claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

45. Rule 23(e) provides:

A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs.

Fed. R. Civ. P. 23(e)

23(a)(1). No one has challenged the district court'sfinding that the proposed class satisfies the numerosity requirement. Indeed, the proposed class consists of more than 8 million present and former policyholders.

### b. Commonality

The commonality prong of Rule 23(a) asks whether"there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).[46] The district court found the proposed class easily satisfied the commonality requirement, citing several common factual and legal issues which the class members would need to establish in order to prove Prudential's liability.[47] Fairness Opinion, 962 F. Supp. at

_____

46. Courts frequently examine the Rule 23(a) requirement of commonality in conjunction with Rule 23(b)(3)'s"predominance" standard, reasoning that the "predominance requirement incorporates the commonality requirement." Georgine, 83 F.3d at 626; 1 Newberg on Class Actions S 3.13, at 3-71. Although the district court followed this approach and examined the predominance and commonality requirements together, appellants have not questioned the court's finding that the proposed class satisfies this element of Rule 23(a).

47. The district court found that plaintiffs would need to establish the following common factual issues at trial:

- Prudential's common course of conduct;

- Prudential's development of the sales presentations and materials,
  and artificial inflation and maintenance of dividend scales;

- the sale of replacement and vanishing premium policies by material omission;

- the misrepresentation of po licies as investment or retirement plans;

- the failure to train or sup ervise agents;

- Prudential's unwillingness to prevent deceptive sales practices; and

- Prudential's scienter.

Fairness Opinion, 962 F. Supp. at 512.

The district court also found that plaintiffs would need to establish the following common legal issues at trial:

512. The district court also noted that the MDL Transfer Order recognized that the transferred actions "involve common questions of fact . . . involv[ing] allegations that deceptive life insurance sales practices occurred or were encouraged as a [sic] result of some larger scheme or schemes organized by Prudential." Id. (quoting August 3, 1995 Transfer Order at 1-2). Finally, the court found Prudential had asserted affirmative defenses which were common to all class members, and independently would satisfy the predominance requirement. Id. at 512-13.48

We believe the court's finding that the proposed class satisfied the commonality requirement was within its sound discretion. A finding of commonality does not require that all class members share identical claims, and indeed "factual differences among the claims of the putative class members do not defeat certification." Baby Neal v. Casey,

_____

        – whether policyholder relian ce could be presumed;

        – whether Prudential's offer to finance a policyholder's purchase of
        a policy constitutes an enforceable financing contract distinct from
        the policy itself;

        – whether Prudential breached the financing contract;

        – whether Prudential breached  an obligation of good faith and fair
        dealing;

        – whether constructive trust principles apply to premiums received
        as a (result of deceptive sales practices;

        – whether compensatory claims  can be effectively quantified on a
        class wide basis; and

        – whether punitive damages sh ould be imposed.

Id.

48. The court also cited the following as examples of issues common to all class members: Prudential's fraudulent concealment of its misrepresentations; the use of substantially similar, and sometimes identical, oral and written misrepresentations by Prudential agents in furtherance of its fraudulent scheme; the required use of pre-approved written marketing materials; and the fact that Prudential trained its agents to use these fraudulent sales techniques. Fairness Opinion, 962 F. Supp. at 513-16.

43 F.3d 48, 56 (3d Cir. 1994) (citing Eisenberg v. Gagnon, 766 F.2d 770 (3d Cir. 1985)).[49] "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." Id. As the district court found, the allegations in the Second Amended Consolidated Complaint raise numerous issues which all members of the class would need to demonstrate in order to succeed at trial. Consequently, the proposed class satisfies Rule 23(a)(2).

c. Typicality

The district court found the claims of the class representatives were typical of the class as a whole. First, the court noted all of the named plaintiffs have alleged either churning, vanishing premium, or investment plan claims, or some combination of the three. Second, it relied on the "prominent guiding thread through all plaintiffs' claims – Prudential's scheme to defraud" to support its conclusion that the claims of the named plaintiffs are typical of the class as a whole. Fairness Opinion, 962 F. Supp. at 518. The court rejected the argument that "the class fails for lack of typicality because no class representative claims to have been injured by `other improper sales practices.' " Id. The court reasoned that the "class members injured by `other fraudulent sales practices' have suffered the same injury – they are victims of Prudential's deception – and have suffered the same generic type of harm – they have economic damages – as the named plaintiffs," thereby satisfying the typicality requirement. Id. at 519 (citing General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 159 (1982)).

On appeal, Krell reasserts his argument that the inclusion of the "other claims" defeats a finding of typicality. In particular, Krell contends the named plaintiffs'

_____

49. Krell objects to the district court's reference to Baby Neal, complaining that the court was inappropriately applying the Rule 23(b)(2) standard for injunctive relief in a Rule 23(b)(3) class action. The objection is clearly without merit. The district court applied Baby Neal in the context of its Rule 23(a) "commonality" analysis, a factor applicable whether the class action is brought under Rule 23(b)(2) or (b)(3).

claims cannot be representative of the class because the "other claims" are not identified. Krell Brief at 29; see also Public Citizen Brief at 13-16. Additionally, Krell contends the court failed to consider the variations among the laws of the 50 states, making its typicality analysis inadequate.[50] Amicus Public Citizen, relying on Falcon, argues plaintiffs must "show that the plaintiff class ha[s] been injured in the same manner as ha[ve] the named representative[s]." Public Citizen Brief at 15 (emphasis omitted).

"The concepts of commonality and typicality are broadly defined and tend to merge." Baby Neal, 43 F.3d at 56 (citing 7A Charles A. Wright, et al., Federal Practice and Procedure S 1764, at 247 (1986)). The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals. Id. at 57 ("The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented."); 1 Newberg on Class Actions, S 3.13. In this respect the commonality and typicality requirements both seek to ensure that the interests of the absentees will be adequately represented. Falcon, 457 U.S. at 157 n.13. However, "neither of these requirements mandates that all putative class members share identical claims." Baby Neal, 43 F.3d at 56; Hassine v. Jeffes, 846 F.2d at 176-77; Weiss v. York Hosp., 745 F.2d 786, 809 (3d Cir. 1984), cert. denied, 470 U.S. 1060 (1985). In addition, "factual differences among the claims of the putative class members do not defeat certification." Baby Neal, 43 F.3d at 56.

We believe the district court's typicality analysis is correct. The named plaintiffs, as well as the members of the proposed class, all have claims arising from the fraudulent

_____

50. Krell also argues the court improperly evaluated the typicality requirement because it merely presumed the factual and legal elements of named plaintiffs' claims were aligned with the claims of absentee class members. Krell's claim that the district court presumed typicality simply ignores the findings contained in the district court's opinion.

scheme perpetrated by Prudential. That overarching scheme is the linchpin of the Second Amended Consolidated Complaint, regardless whether each class member alleges a churning claim, a vanishing premium claim, an investment plan claim, or some other injury falling within the category of "other sales" claims. "Commentators have noted that cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." Baby Neal, 43 F.3d at 58. Consequently, the factual distinctions among and between the named plaintiffs and the 8 million putative class members do not defeat a finding of typicality. "[E]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories" or where the claim arises from the same practice or course of conduct. Id.

This conclusion is further buttressed by the Supreme Court's holding in Falcon. The Supreme Court reversed certification of a class of Mexican-Americans who were challenging their employers hiring and promotion decisions on typicality grounds.[51] Falcon, 457 U.S. at 157-59. Krell relies on Falcon for the proposition that "across-the-board" classes do not satisfy Rule 23. Krell Brief at 27-28. We disagree. Falcon did not strike down "across-the-board" classes per se, and, in fact, it agreed "with the proposition underlying the across-the-board rule – that racial discrimination is by definition class discrimination." Falcon, 457 U.S. at 157. The Court nonetheless reversed the class certification because the district court had improperly presumed that Falcon's claims were typical of the class claims. In particular, the Court emphasized that Falcon's claim was based on the theory of disparate treatment, while

_____

51. Falcon involved a Mexican-American employee who was denied a promotion, allegedly based on his national origin. After obtaining a right-
to-sue letter from the EEOC, Falcon commenced a class action under Title VII of the Civil Rights Act of 1964, alleging discrimination against Mexican-Americans with respect to promotion. The class, however, was comprised of all Mexican-American employees and Mexican-Americans who had been denied employment.

51

the class claims relied on the theory of disparate impact. Consequently, Falcon would need to "prove much more than the validity of his own claim" in order to prove the claims of the absentee class members, and thus his claims were not typical of the class. Id. at 158.

The present case is readily distinguishable. Unlike the plaintiff in Falcon, the named plaintiffs here have not relied on allegations that they were singled out and defrauded by Prudential. They have instead alleged that they suffered harm as the result of the same company-wide conduct that injured the absentee class members. The various forms which their injuries may take do not negate a finding of typicality, provided the cause of those injuries is some common wrong. Baby Neal, 43 F.3d at 58 (citing Falcon, 457 U.S. at 157-59) ("Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice."). In this instance, the alleged common scheme provides an appropriate basis for a finding of typicality. Since all members of the class would need to demonstrate the existence of this scheme, their interests are sufficiently aligned that the class representatives can be expected to adequately pursue the interests of the absentee class members. Amchem, 117 S. Ct. at 2248 (Rule 23 asks "whether a proposed class has sufficient unity so that absent class members can fairly be bound by decisions of class representatives").

d. Adequacy of Representation

The final Rule 23(a) prerequisite encompasses two distinct inquiries designed to protect the interests of absentee class members. First, the adequacy of representation inquiry "tests the qualifications of the counsel to represent the class." G.M. Trucks, 55 F.3d at 800. Second, it "serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem, 117 S. Ct. at 2250. The district court found that both class counsel and the named plaintiffs satisfied these tests.

52

With respect to class counsel, the court found that plaintiffs' counsel were highly competent and experienced class action attorneys, and had pursued the interests of the class vigorously. Fairness Opinion, 962 F. Supp. at 519-20. With respect to the class representatives, the court found named plaintiffs' interest in proving Prudential's"knowledge and orchestration of the scheme to defraud" and their "interest in obtaining relief commensurate with individual injury," as well as punitive damages, demonstrates that "there are no disparate interests to impair plaintiffs' incentive to prosecute fully all aspects of their claims against Prudential." Id. at 521.

Krell contests the district court's analysis on several grounds. First, Krell disputes the district court'sfinding that class counsel adequately served the interests of the class. In particular, Krell argues that class counsel failed to take adequate discovery, and that an improper "clear sailing" fee agreement between class counsel and Prudential created an impermissible conflict of interest.52 Krell Brief at 19-21, 51-53.

Second, Krell contends the inclusion of the category of "other claims" defeats a finding of adequate representation. Krell argues because policyholders have an equity interest in any "surplus" of Prudential, the expansion of the class to include policyholders with unidentified "other claims," whose interests were "adverse to those with asserted claims," created a detriment on behalf of the"other" policyholders for the benefit of those with asserted claims. According to Krell, this conflict destroys the adequacy of named plaintiffs' representation.

Third, Krell repeats his argument that the court's failure to consider the variations among the laws of the 50 states demonstrates that there was no adequate protection of the claims of absentees. In particular, Krell claims there was a conflict between class members with replacement claims and those without, so that the district court should have

_____

52. The court specifically noted that the fee agreement negotiated with Prudential subsequent to the negotiation of the Proposed Settlement did not undermine the adequacy of class counsel's representation. Fairness Opinion, 962 F. Supp. at 519; see also infra S VI.C.1.

created a subclass of replacement claimants.53 Finally, both Krell and Public Citizen argue the proposed class improperly includes a subset of "futures" claimants, thereby running afoul of Amchem.

We believe the district court exercised its sound discretion when it found class counsel and the named plaintiffs adequately represent the class. First, we believe class counsel vigorously pursued this class action. Both the uncapped nature of the proposed settlement and the "unprecedented" outreach program indicate that class counsel and the named plaintiffs have attempted to serve the best interests of the class as a whole. Further, we agree with the district court's finding that the attorneys' fee arrangement between class counsel and Prudential did not affect the adequacy of representation. See infra S VI.C.1.

Second, we also agree with the district court that the named plaintiffs adequately represent the interests of the absentee class members. As discussed, the crux of this class action is the allegation that Prudential engaged in a scheme to defraud policyholders by means of company-wide deceptive sales practices. The named parties, like the members of the class, would need to establish this scheme in order to succeed on any of the claims in the Second Amended Consolidated Complaint. Even those class members with "other" claims share the common task of demonstrating the existence and implementation of this scheme. Consequently, we believe the proposed class satisfies the adequacy of representation requirement of Rule 23(a).

We also reject the argument that the class as constituted included persons who are currently unaware of their injury, and that this "futures" class is barred under Amchem. Amchem, of course, found the proposed class did not meet the adequacy of representation standard because the interests of those with present injuries differed from those with "futures" claims. Amchem, 117 S. Ct. at 2251 (finding that the economic interest of the currently injured

_____

53. The district court explicitly rejected this argument. Fairness Opinion,
962 F. Supp. at 522. For a more detailed discussion of Krell's replacement claims, see infra S V.A.4.

54

claimants "tugs against the interest of the exposure-only plaintiffs"). But Amchem is easily distinguished on its facts. Unlike the "exposure-only" plaintiffs in Amchem, the class members here need not wait to determine if they have been harmed by Prudential's fraudulent sales practices. There is no "future" manifestation of injury, because any injury suffered by a member of the class has already occurred. Having received notice of the pending class action and the availability of relief, members of the class can determine whether they have been victims of Prudential's fraud, either through a review of their records or by calling the toll-free number established by the settling parties. Consequently, the district court exercised its sound discretion infinding the proposed class meets the adequacy of representation requirement of Rule 23(a)(4).

### 2. The Rule 23(b) Criteria

In order to certify an opt-out class under Rule 23(b)(3) the district court must make two additional findings: predominance and superiority. Issues common to the class must predominate over individual issues, and the class action device must be superior to other means of handling the litigation. The district court found both requirements were satisfied.

#### a. Predominance

The Supreme Court's recent decision in Amchem addressed the application of the predominance prong to "settlement only" classes. Although the Court made clear that consideration of the proposed settlement was proper when making a decision on class certification, it also placed limits on the weight to be accorded to the settlement. In particular, Amchem rejected the idea that the potential benefits of settlement are relevant to the predominance inquiry. According to the Court, the predominance "inquiry trains on the legal or factual questions that qualify each member's case as a genuine controversy, questions that preexist any settlement." Amchem, 117 S. Ct. at 2249. The court noted the "claims and defenses" relevant to both the predominance test and the Rule 23(a)(4) adequacy of representation inquiry "refer to the kinds of claims or

55

defenses that can be raised in courts of law as part of an actual or impending law suit." 117 S. Ct. at 2249 n.18 (quoting Diamond v. Charles, 476 U.S. 54, 76-77 (1986) (O'Connor, J. concurring in part and concurring in judgment)).

In its predominance determination, the court focused primarily on plaintiffs' allegation that Prudential engaged in a common course of conduct by which it defrauded class members, and concluded that "[w]here many purchasers have been defrauded over time by similar misrepresentations, or by a common scheme to which alleged non-disclosures related, courts have found that the purchasers have a common interest in determining whether the defendant's course of conduct is actionable." Fairness Opinion, 962 F. Supp. at 511 (citations omitted).

The district court also rejected the argument that claimants' need to demonstrate reliance destroyed predominance, reasoning that "reliance is an issue secondary to establishing the fact of defendant's liability." Id. at 516 (citing 1 Newberg S 4.26 at 4-104) ("Challenges based on . . . reliance have usually been rejected and will not bar predominance satisfaction because [reliance pertains] to the right of a class member to recover in contrast to underlying common issues of the defendant's liability."). Additionally, the court noted that"most of the plaintiffs' claims do not even involve a reliance element," including their claims for breach of contract, breach of implied obligation of good faith and fair dealing, negligence, negligent training and supervision, and unjust enrichment. Id. Finally, the court found that, because "plaintiffs' fraud-based claims stem largely from misleading omissions," reliance can be presumed. Id.

The district court also distinguished this case from Georgine. First, the court reasoned that "Prudential's alleged intentional use of the fraudulent sales tactics provides the `single central issue' lacking" in Georgine. Id. at 511 n.45. Whereas Georgine involved a variety of claims encompassing scores of individual issues, a trial in this instance would be focused on Prudential management's conduct. Id. Second, the court noted the class here is comprised of persons who purchased one type of product

56

(life insurance policies) from one company, in contrast to the Georgine class members who were exposed to different asbestos-containing products manufactured by different companies. Finally, the district court noted the class here lacked "futures" plaintiffs, because "class members are readily identifiable and have already suffered injury by the purchase of a product that was misrepresented." Id.

As the Supreme Court noted in Amchem, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws. . . . [e]ven mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement." Amchem, 117 S. Ct. at 2250 (citing Adv. Comm. Notes, 28 U.S.C. App., p. 697). This case, involving a common scheme to defraud millions of life insurance policy holders, falls within that category. The district court's opinion sets forth a litany of common issues which the class must demonstrate in order to prevail. See supra S IV.B.1 and n.47-48. While individual questions may arise during the course of this litigation, we agree with the district court that the presence of individual questions does not per se rule out a finding of predominance. In particular, the "presence of individual questions as to the reliance of each investor does not mean that the common questions of law and fact do not predominate." Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985).

Krell contends the district court did not conduct a proper analysis under Rule 23(b)(3), and instead "presumed" predominance by finding the central issue in this case was nationwide deceptive conduct by Prudential's management. We disagree. A review of the district court's fairness opinion belies the contention that it merely presumed predominance. See Fairness Opinion, 962 F. Supp. at 510-17. The district court's finding that common issues predominated in this case was within its sound discretion, was supported by the record, and was amply demonstrated in its opinion.

Krell also reasserts his argument that the class here suffers the same defects as the class of asbestos plaintiffs in Amchem. We find the district court's analysis of this comparison convincing. The two cases are markedly

different, and easily distinguished. The Amchem class failed the predominance inquiry because of the disparate questions facing class members, based in part on their differing levels of exposure, their differing medical histories, and the presence of exacerbating conditions such as smoking. Of course, the complexity of a case alleging physical injury as a result of asbestos exposure differs greatly from a case alleging economic injury as a result of deceptive sales practices. The elements of proof are less difficult when the vagaries of medical testimony and scientific expertise are removed from consideration. Furthermore, the Amchem class was further undermined by the schism between the differing medical needs of currently injured class members and exposure-only or "futures" claimants. As noted, there is no "futures" class in this case.

We also reject Krell's contention that predominance is defeated because the class claims are subject to the laws of the fifty states. Courts have expressed a willingness to certify nationwide classes on the ground that relatively minor differences in state law could be overcome at trial by grouping similar state laws together and applying them as a unit. This Court has affirmed a class certification based on a "creditable showing, which apparently satisfied the district court, that class certification [did] not present insuperable obstacles" relating to variances in state law. See In re School Asbestos Litigation, 789 F.2d 996, 1010 (3d Cir. 1986).54 In this instance Krell has failed to demonstrate that the differences in applicable state law were sufficient to foreclose a similar approach.55 In support of class certification, plaintiffs compiled "a series of charts setting forth comprehensive analyses of the various states' laws potentially applicable to their common law claims." Fairness Opinion, 962 F. Supp. at 525. The court concluded that the "elements of these common law claims are substantially similar and any differences fall into a

_____

54. While we reached a different conclusion in Georgine, our decision there turned on our belief that the case "could not be broken into anywhere near that small a number of patterns." 83 F.3d at 627 n.13.

55. In addition, Krell's concern is addressed by the fact that "the ADR scoring procedures specifically incorporate state replacement regulations." Fairness Opinion, 962 F. Supp. at 550 n.79.

limited number of predictable patterns." Id. The district court "considered the choice of law issues that confront[ed] the Court and conclude[d] that these choice of law issues [did] not render this class action unmanageable." Id. We agree.

### b. Superiority

Rule 23(b)(3) sets out several factors relevant to the superiority inquiry.[56] The district court addressed these factors and found the class action mechanism was superior to other possible means of adjudicating this case. First, the court examined the relatively modest size of individual claims and the sheer volume of those claims in the aggregate, and concluded a class action presented the "only rational avenue of redress for many class members." Id. at 523. Second, the court reasoned the relatively small number of individual suits pending against Prudential indicated that individual policyholders lacked a compelling interest to control the prosecution of their own claims, and at the same time represented a potentially great strain on judicial resources. Third, the court found it was appropriate to litigate the case in New Jersey, Prudential's principal place of business. Finally, the district court determined that the case, while challenging, would not present insurmountable case management problems if it were tried.[57] Id. at 525.

_____

56. Rule 23(b)(3) lists the following factors for consideration by the courts:

> (A) the interest of members of the class in individually controlling
> the prosecution or defense of separate actions; (B) the extent and
> nature of any litigation concerning the controversy already
> commenced by or against members of the class; (C) the desirability
> or undesirability of concentrating the litigation of the claims in the
> particular forum; (D) the difficulties likely to be encountered in the
> management of a class action.

Fed. R. Civ. P. 23(b)(3).
57. While we believe the district court correctly analyzed whether application of the laws of the fifty states would be manageable, we note this analysis, depending on the facts in each case, may no longer be necessary in the context of settlement-only class certification. See Amchem, 117 S. Ct. at 2248 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.").

Krell objects to the finding of superiority, claiming the district court erred by only comparing the nationwide class with the prospect of individual proceedings, without considering the possibility of subclasses and without allowing Krell to develop the subclass issue.

The superiority requirement asks the court "to balance, in terms of fairness and efficiency, the merits of a class action against those of `alternative available methods' of adjudication." Georgine, 83 F.3d at 632 (citing Katz v. Carte Blanche Corp., 496 F.2d 747, 757 (3d Cir.) (en banc), cert. denied, 419 U.S. 885 (1974)). We believe the court's superiority determination was within its sound discretion. With respect to Krell's subclass argument, the district court found no conflict between replacement and non-replacement claimants. Fairness Opinion, 962 F. Supp. at 522. We agree. As discussed infra at S V.A.4., Krell has not demonstrated that replacement claimants differ from other class members so as to require the creation of a subclass. Because the replacement claimants did not require specialized or distinct treatment, the court's failure to create a separate subclass for those claimants, as well as its superiority determination, was not an abuse of discretion.[58]

C. Conclusion

Based on our review of the prerequisites of Rule 23(a) and 23(b)(3), we believe the "proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives." Amchem, 117 S. Ct. at 2248. Consequently, we will affirm the district court's certification of the class.

V. THE FAIRNESS OF THE PROPOSED SETTLEMENT

Even if it has satisfied the requirements for certification under Rule 23, a class action cannot be settled without the approval of the court and a determination that the proposed settlement is "fair, reasonable and adequate."[59]

_____

58. The district court expressly left open the possibility that it would create subclasses if they became necessary. Fairness Opinion, 962 F. Supp. at 525.

59. Both Rule 23(e) and Rule 23(c) require that notice of the proposed settlement be given to all members of the class as directed by the court. For a discussion of the notice provided, see discussion infra S V.C.2.

G.M. Trucks, 55 F.3d at 785. "Rule 23(e) imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims." Id. at 805 (citations omitted).

In deciding the fairness of a proposed settlement, we have said that "[t]he evaluating court must, of course, guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." Id. at 806 (citations omitted). At the same time, we have noted that cases such as this, where the parties simultaneously seek certification and settlement approval, require "courts to be even more scrupulous than usual" when they examine the fairness of the proposed settlement. Id. at 805. This heightened standard is designed to ensure that class counsel has demonstrated "sustained advocacy" throughout the course of the proceedings and has protected the interests of all class members. Id. at 806.

"The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975). Because of the district court's proximity to the parties and to the nuances of the litigation, we accord great weight to the court's factual findings. Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1305–6 (3d Cir. 1993) (citing Ace Heating & Plumbing Co. v. Crane Co., 453 F.2d 30, 34 (3d Cir. 1971)).

As the district court recognized, our decision in Girsh sets out appropriate factors to be considered when determining the fairness of a proposed settlement. Those factors are:

> (1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through trial . . . ; (7) the ability of the

61

defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . . .

Girsh, 521 F.2d at 157 (quoting City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974)) (the "Girsh factors"). The court examined each of these factors and found "the Proposed Settlement is indeed fair, reasonable, and adequate and should be approved." Fairness Opinion, 962 F. Supp. at 534.

In addition to the Girsh analysis, the district court offered other reasons for its conclusion that the settlement was fair and reasonable. Describing the proposed settlement as "exceptional," the court noted the settlement's structure was based on the class action settlements approved in Willson v. New York Life Ins. Co., No. 94-127804, 1995 N.Y. Misc. LEXIS 652 (N.Y. Sup. Ct. Feb. 1, 1996), aff'd, 644 N.Y.S.2d 617 (A.D. 1st Dep't), and Michaels v. Pheonix Home Life Ins. Co., No. 95-5318, 1997 N.Y. Misc. LEXIS 171 (N.Y. Sup. Ct. Jan. 3, 1997), both of which received the praise of "[c]ourts, academic and industry experts, and various independent organizations." Fairness Opinion, 962 F. Supp. at 535. The court also relied on the expertise of the insurance regulators from the fifty states and the District of Columbia, all of whom endorsed the settlement.

The court found the terms of the settlement "benefit[ ] the class enormously," emphasizing the uncapped nature of the relief, the fairness of the ADR process, and the availability of Basic Claim Relief to those class members who either elect not to participate in the ADR process or who cannot demonstrate they have a compensable claim. The court found this relief was enhanced by the inclusion of "Additional Remediation Amounts," which it described as the "punitive damage counterpart to the Proposed Settlement," and by Prudential's agreement to pay all attorneys' fees and costs associated with the settlement. Id. at 535-36. Finally, the court emphasized the settlement provided class members the opportunity to file claims immediately after court approval of the settlement, rather

than waiting through what no doubt would be protracted litigation. Id. at 536.

Krell raises several challenges to the district court's fairness determination.60 First, Krell claims the district court applied several of the Girsh factors improperly, and in some cases not at all, and that it erred by not creating a separate subclass to address replacement claims. Krell Brief at 43-50. Second, he contends the district court's fairness determination violated the McCarran-Ferguson Act and the Rules Enabling Act by altering the substantive contractual and statutory insurance rights of the class. Id. at 36-40. Finally, Krell alleges the certification and fairness proceedings lacked due process. Id. at 40-42.

_____

60. Prudential contends that nearly "[e]very argument Krell makes is based on th[e] mistaken premise that his `replacement claims' were stronger than the misrepresentation claims of the other Class Members." Prudential Brief at 41 & n.10. As a result, Prudential argues, all but one of the objections to the settlement's fairness are"felled by Krell's error of
law." Id. We do not agree that Krell's arguments can be dismissed so easily, and will address Krell's replacement claim objections in the context of his other arguments.